# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### May 28, 2008 Session Heard at Cookeville[1]

## STATE OF TENNESSEE v. RANDY LEE MEEKS ET AL.

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Coffee County**
**No. 34,241     Jerry Scott, Senior Judge and L. Craig Johnson, Judge**

---

**No. M2006-01385-SC-R11-CO - Filed September 2, 2008**

---

This appeal involves the warrantless search of a motel room containing an actively operating methamphetamine laboratory. After the occupants of the room were indicted for manufacturing methamphetamine and for possessing methamphetamine and drug paraphernalia, they filed a motion in the Circuit Court for Coffee County seeking to suppress the evidence found in the motel room. The trial court granted the motion to suppress and dismissed the indictment. The State appealed, and the Court of Criminal Appeals reversed the trial court's decision to suppress the evidence and vacated the order dismissing the indictment. *State v. Meeks*, No. M2006-01385-CCA-R3-CO, 2007 WL 1987797 (Tenn. Crim. App. July 10, 2007). We granted the defendants' Tenn. R. App. P. 11 application for permission to appeal to address more fully the principles applicable to warrantless searches of actively operating methamphetamine laboratories when the State asserts that the officers were acting to avert a serious and immediate risk of injury to themselves or others. Like the Court of Criminal Appeals, we have determined that the trial court erred by granting the motion to suppress and by dismissing the indictment.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

Robert T. Carter and Eric J. Burch, Tullahoma, Tennessee, for the appellants, Randy Meeks and Ernest L. Snyder, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Senior Counsel; C. Michael Layne, District Attorney General; and Felecia Walkup, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]Oral argument was heard in this case in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

# OPINION

## I.

At approximately 11:45 p.m. on March 6, 2005, one of the occupants of Room 109 of the Park Motel in Manchester, Tennessee telephoned the Manchester Police Department to report a strange odor in her motel room. When Officer Scott Peterson returned the call, the caller told him that the odor appeared to be coming from an adjoining room and that the odor was causing her and her mother to have burning eyes and headaches.

The caller also asked Officer Peterson "[w]hat does a meth lab smell like? What does making methamphetamine smell like?" Officer Peterson informed her that an actively operating methamphetamine laboratory has a distinct odor that is difficult to describe. After talking with the caller for approximately five minutes, Officer Peterson decided to follow up on the call. Even though the Manchester Police Department had received other similar calls that ultimately did not involve a methamphetamine laboratory, Officer Peterson was aware that other methamphetamine laboratories had been found at the Park Motel.

Officer Peterson met with the caller in Room 109 of the Park Motel. Upon entering the room, he discovered that the odor, particularly in the bathroom area, was instantly recognizable and unmistakable. The odor indicated that the occupants of Room 110 were manufacturing methamphetamine. Officer Peterson also noted that the caller and her elderly mother were still complaining of burning eyes and headaches – symptoms consistent with the effects of the toxic fumes produced when methamphetamine is being manufactured.

Officer Stuart Caldwell arrived at the Park Motel shortly after Officer Peterson. Officer Caldwell is certified as an expert regarding the production of methamphetamine. He has examined more than two hundred laboratories making methamphetamine, and he has been involved in more than one hundred and fifty methamphetamine prosecutions. Simply by standing in front of the door to Room 110, Officer Caldwell "could smell what [he] knew to be a meth lab."

Officers Peterson and Caldwell decided to knock on the door of Room 110 to speak with the occupant or occupants of the room. The officers received no response to their knocks, but with every knock, the odor intensified because the door was quite flimsy. In fact, the odor was so strong that Officer Peterson was forced to stand beside, rather than directly in front of, the door in order to avoid the fumes. While Officers Peterson and Caldwell were knocking on the door, they were joined by Corporal Ronny Gray who also immediately noticed the extremely strong odors of the ongoing manufacture of methamphetamine. The occupants of Room 110 did not respond to the officers' knocking, but the officers heard someone's voice inside the room and also heard the sound of breaking glass.

The officers then discussed their next course of action in light of the intensity of the odors emanating from Room 110. Officer Peterson understood that methamphetamine manufacturing

created dangerous fumes and a risk of explosion. Officer Stuart was aware that the "presence of the chemicals there are dangerous in themselves, but when you start mixing those chemicals, it starts producing phosphine gas, hydrochloric gas, several gases that in just one part per million can kill you." He also feared the possibility of fatalities because the occupants of Room 110 and persons in the vicinity of the room risked inhaling the toxic fumes, explosion, and fire. Corporal Gray agreed that the situation posed a "threat." Collectively, the officers agreed that they should enter Room 110 because of the dangers posed by manufacturing methamphetamine. The officers made this decision approximately five to ten minutes after Officer Peterson first arrived at the Park Motel.

Corporal Gray obtained a key to Room 110 from the motel manager. When the officers unlocked the door, it still would not open completely because of a chain lock on the interior of the door. However, a large cloud of fumes escaped from the room through the partially opened door. The officers identified the fumes as a chemical cloud and concluded that the conditions in the room were extremely hazardous. Officer Peterson indicated that the air inside the room was not something that he "really want[ed] to be breathing" and that it posed a danger to others nearby. Officer Caldwell noted that the chemicals were capable of creating a fire. The officers continued to identify themselves in loud voices and to demand that the occupants of the room come to the door. Despite these commands, the occupants of the room still did not comply.

After receiving no response, the officers kicked in the door to Room 110. A hot plate with a glowing red heating element and bottles of peroxide and other unidentified liquids were near the door. Two men were in the room. Ernest Snyder stood in the bathroom with one of his hands behind his back. Randy Meeks was lying unconscious on the bed. When Mr. Snyder refused to comply with their commands to put his hands up, the officers removed him from the room. The intensity of the fumes in the room prevented the officers from re-entering.

Before removing Mr. Meeks from the room, Officer Caldwell and Corporal Gray donned air suits they had obtained from the fire department. When they re-entered the room, Mr. Meeks was still lying unconscious on the bed. The officers dragged him from the room, and paramedics were able to resuscitate him. Mr. Meeks remained incoherent at the scene and was in intensive care for an extended period of time. Mr. Snyder also required hospitalization. Approximately ten minutes elapsed between the officers' first entry into Room 110 and their removal of Mr. Meeks.

After Messrs. Meeks and Snyder were removed from the room, the officers called a hazardous materials team to the motel and placed an exhaust fan in Room 110. The persons who had been in the rooms adjacent to Room 110, including the person who placed the original telephone call to the police and her elderly mother, were relocated to other motels in Manchester. Later, when he was cross-examined regarding the decision not to evacuate the motel before entering Room 110, Officer Caldwell conceded that failing to remove the other motel occupants was "poor judgment" and that "[w]e should have done that first."

Using the information obtained from their warrantless entry of Room 110, the officers secured a search warrant. When the authorities searched Room 110, they found methamphetamine

on the dresser, as well as evidence of a methamphetamine laboratory, including an HCL gas generator, plastic tubing, aluminum foil, a bottle of iodine crystals, a bottle containing muriatic acid, a Mason jar containing separating liquids, a plastic container of ephedrine, a gallon jug of iodine, and disposable plastic gloves.

In April 2005, a Coffee County grand jury indicted Messrs. Meeks and Snyder for manufacturing methamphetamine, possessing methamphetamine, and possessing drug paraphernalia. In July 2005, Messrs. Meeks and Snyder filed a motion in the Circuit Court for Coffee County seeking to suppress the evidence seized in Room 110 on the ground that the warrantless entry was not justified by exigent circumstances. Following an October 10, 2005 hearing, the trial court entered an order on November 9, 2005, granting the motion to suppress. Placing great significance on the fact that the officers had not evacuated the occupants of the adjoining rooms before they entered Room 110, the trial court concluded that the State had failed to demonstrate the existence of the sort of exigent circumstances that would justify a warrantless search.

The State sought review of the trial court's November 9, 2005 order by the Court of Criminal Appeals. On July 10, 2007, the Court of Criminal Appeals filed an opinion reversing the trial court's suppression order and vacating the order dismissing the indictment. *State v. Meeks*, No. M2006-01385-CCA-R3-CO, 2007 WL 1987797 (Tenn. Crim. App. July 10, 2007). Relying on one of its unreported opinions,[2] the Court of Criminal Appeals held that the warrantless entry and search of Room 110 was proper because the actions of Messrs. Meeks and Snyder "did indeed present an immediate threat to public safety." *State v. Meeks*, 2007 WL 1987797, at *8. The court also held that the "probable cause to search was present and accompanied by exigent circumstances – the dangers associated with the active production of methamphetamine in a hotel room." *State v. Meeks*, 2007 WL 1987797, at *8.

Messrs. Meeks and Snyder filed a Tenn. R. App. P. 11 application for permission to appeal. They assert (1) that the Court of Criminal Appeals violated their due process rights by invoking Tenn. R. App. P. 4(a) to permit the State to file a notice of appeal after the expiration of the thirty-day deadline and (2) that the Court of Criminal Appeals erred by reversing the trial court's November 9, 2005 order granting their motion to suppress the evidence found in Room 110. We granted Messrs. Meeks and Snyder permission to appeal to address more fully the principles applicable to warrantless searches of actively operating methamphetamine laboratories when the State asserts that the officers were acting to avert a serious and immediate risk of injury to themselves or others.

## II.

Messrs. Meeks and Snyder assert that the Court of Criminal Appeals erred by permitting the State to pursue its appeal from the trial court's November 9, 2005 suppression order. They argue

---

[2] *State v. Castile*, No. M2004-02572-CCA-R3-CD, 2006 WL 1816371 (Tenn. Crim. App. June 28, 2006) (No Tenn. R. App. P. 11 application filed).

that the appeal is not timely and that the Court of Criminal Appeals' decision to permit the State to pursue the appeal "in the interest of justice" violates their due process rights. The State, arguing in the alternative, insists that its appeal was timely but, if it was not, that the Court of Criminal Appeals properly invoked Tenn. R. App. P. 4(a) to allow the appeal to proceed. We have determined that invoking the relief provisions in Tenn. R. App. P. 4(a) was unnecessary because the State filed a timely notice of appeal.

## A.

On July 11, 2005, Messrs. Meeks and Snyder filed a joint motion to suppress the evidence seized in Room 110. Following a hearing on October 10, 2005, the trial court entered an order on November 9, 2005, granting the motion to suppress. The order did not purport to dismiss the pending indictments against Messrs. Meeks and Snyder.

On November 17, 2005, the State filed a motion in the trial court seeking permission to pursue an interlocutory appeal under Tenn. R. App. P. 9. The State asserted in this motion that pursuing an interlocutory appeal was "necessary to prevent the State from suffering irreparable injury in that the State would be unable to successfully maintain prosecution of the defendants unless this motion is granted."[3] On March 2, 2006, the trial court entered an order granting the State permission to pursue an interlocutory appeal. The court found explicitly in this order that "the suppression of the evidence gathered in this case from room 110 of the Park Place Motel could present irreparable harm to the State's case in chief and is dispositive to the case."

For some reason not apparent in this record, the State did not file an application for permission to appeal with the Court of Criminal Appeals by the deadline in Tenn. R. App. P. 9(c).[4] However, on March 14, 2006, the day following the deadline for filing the application for an interlocutory appeal, the State, through an assistant district attorney general, asked the trial court to place the case on its March 17, 2006 docket, apparently for the purposes of withdrawing the application for an interlocutory appeal and dismissing the indictments against Messrs. Meeks and Snyder. On May 19, 2006, the trial court filed an agreed order dismissing the cases against Messrs. Meeks and Snyder "without prejudice." In this order, the trial court reiterated its earlier finding that "the suppression of the evidence gathered in this case from Room 110 of the Park Place Motel does present irreparable harm to the State's case in chief and is dispositive of the case."

The assistant district attorney general thereafter filed a notice of appeal on June 16, 2006. Despite the fact that the parties had agreed to the dismissal of the State's interlocutory appeal pursuant to Tenn. R. App. P. 9, this notice states that the State is seeking an appeal pursuant to Tenn.

---

[3]This representation by the assistant district attorney general who prepared the Tenn. R. App. P. 9 motion contradicts the assertion in the State's brief filed in this Court that it was not until much later that the district attorney determined that the suppression of the evidence would be fatal to the case against Messrs. Meeks and Snyder.

[4]At this stage of the proceeding, the responsibility for pursuing the appeal shifted from the Office of the District Attorney General to the Office of the Attorney General and Reporter. Tenn. Code Ann. § 8-6-109(b)(2) (Supp. 2007).

R. App. P. 9, rather than Tenn. R. App. P. 3. The defendants detected this procedural anomaly. They argued to the Court of Criminal Appeals that the State's appeal was untimely and improperly filed under Tenn. R. App. P. 9. The Office of the Attorney General and Reporter treated the case as a routine Tenn. R. App. P. 3 appeal and did not bother to address the argument that the appeal was improperly filed under Tenn R. App. P. 9.

In its opinion filed on July 10, 2007, the Court of Criminal Appeals concluded that the trial court's November 9, 2005 suppression order "had the substantive effect of dismissing the indictment against the Defendants" and, therefore, that it was immediately appealable under Tenn. R. App. P. 3(c)(1). *State v. Meeks*, 2007 WL 1987797, at *4. The court also held that even though the State should have filed its notice of appeal within thirty days after the entry of the November 9, 2005 order, it would waive this procedural deficiency "in the interests of justice" in accordance with Tenn. R. App. P. 4(a) and consider the substance of the State's appeal. *State v. Meeks*, 2007 WL 1987797, at *4.

**B.**

Under the common law, as understood and applied in the United States, neither a state nor the United States had a right to appeal in a criminal prosecution, unless the right is expressly conferred by a constitutional provision or by statute. *Arizona v. Manypenny*, 451 U.S. 232, 246 (1981); *United States v. Sanges*, 144 U.S. 310, 312 (1892); *State v. Reynolds*, 5 Tenn. (4 Hayw.) 110, 110 (1817). A general grant of appellate jurisdiction does not satisfy this requirement. *United States v. Sanges*, 144 U.S. at 322-23; *State v. Reynolds*, 5 Tenn. (4 Hayw.) at 110-11. When a statute affords a state or the United States the right to an appeal in a criminal proceeding, the statute will be strictly construed to apply only to the circumstances defined in the statute. *Carroll v. United States*, 354 U.S. 394, 400 (1957); *State v. Adler*, 92 S.W.3d 397, 400 (Tenn. 2002).

The first Tennessee statutes giving the State a right to appeal in criminal cases appeared in 1858.[5] These statutes provided the state with a broad right to appeal from final orders, subject to the double jeopardy protections in Article I, Section 10 of the Constitution of Tennessee and the Fifth Amendment to the United States Constitution. However, this Court, construing these statutes narrowly, concluded that they did not confer on the state the right to appeal from preliminary or interlocutory orders in criminal cases. *State v. Bonhart*, 223 Tenn. 582, 590-91, 448 S.W.2d 669, 672-73 (1969).[6]

---

[5] Code of Tennessee §§ 5244 to 5250 (Return J. Meigs & William F. Cooper eds., E.G. Eastman & Co. 1858) (later codified at Tenn. Code Ann. §§ 40-3401 to -3404, 40-3409 to -3410 (1975) (repealed 1981)).

[6] Tennessee's courts later held that the State could obtain limited review of an interlocutory suppression order using a petition for writ of common-law certiorari in cases where the suppression order had the effect of completely and effectively ending the prosecution. *State v. Johnson*, 569 S.W.2d 808, 814-15 (Tenn. 1978); *State v. Gant*, 537 S.W.2d 711, 712-14 (Tenn. Crim. App. 1975).

Tennessee's statutes governing the State's right to appeal in criminal cases were replaced by the Tennessee Rules of Appellate Procedure, which became effective on July 1, 1979.[7] With regard to the State's appeal as of right, Tenn. R. App. P. 3(c) provided:

> In criminal actions an appeal as of right by the state lies only from an order or judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Criminal Appeals: (1) the substantive effect of which results in dismissing an indictment, information, or complaint; (2) setting aside a verdict of guilty and entering a judgment of acquittal; (3) arresting judgment; (4) granting or refusing to revoke probation; or (5) remanding a child to the juvenile court.

In 1980, Tenn. R. App. P. 3(c) was amended to state explicitly that the State was also entitled to an appeal as of right from final judgments in habeas corpus, extradition, and post-conviction proceedings.

With regard to the State's right to an appeal from an interlocutory order in criminal cases, Tenn. R. App. P. 9(g) explicitly states that both the State and the accused have a right to pursue an appeal from an interlocutory order under Tenn. R. App. P. 9. Similarly, Tenn. R. App. P. 10(e) explicitly permits both the State and the accused to pursue an extraordinary appeal under Tenn. R. App. P. 10.[8]

Unlike other states, Tennessee does not have a statute or rule that specifically applies to orders suppressing or excluding evidence.[9] Thus, the courts and the litigants have been left to work through the application of the Tenn. R. App. P. 3(c), 9, and 10 to orders granting an accused's motion to suppress or exclude evidence. The results have produced procedural confusion because of the differing impacts that a suppression order can have.

An order suppressing or excluding evidence is not a final order or judgment because it does not formally terminate the prosecution. While such an order may have the same practical effect as an order of dismissal, an order suppressing or excluding evidence leaves the State with the option of proceeding with the prosecution with its remaining evidence or of dismissing the indictment under Tenn. R. Crim. P. 48. Under Tenn. R. App. P. 3(c)(1), the State has an appeal as of right only when the "substantive effect" of the order suppressing or excluding the evidence "results in dismissing an indictment, information, or complaint."

---

[7] In 1981, the Tennessee General Assembly expressly repealed the statutes pertaining to the State's right to appeal in criminal cases. Act of June 3, 1981, ch. 449, § 1(13), 1981 Tenn. Pub. Acts 667, 669.

[8] The grounds for seeking an extraordinary appeal under Tenn. R. App. P. 10 are similar to the grounds for seeking a common-law writ of certiorari. *State v. Willoughby*, 594 S.W.2d 388, 392 (Tenn. 1980).

[9] 7 Wayne R. LaFave, et al., *Criminal Procedure* § 27.3(c), at 39-42 (3d ed. 2007) ("*Criminal Procedure*").

Interpreting Tenn. R. App. P. 3(c)(1), the Court of Criminal Appeals requires only that the suppression order have the "substantive effect of dismissing the indictment."[10] Thus, the Court of Criminal Appeals holds that Tenn. R. App. P. 3(c)(1) does not require an order dismissing the indictment, information, or complaint as a prerequisite to an appeal by the State. *See*, *e.g.*, *State v. Holladay*, No. E2004-02858-CCA-R3-CD, 2006 WL 304685, at *2 (Tenn. Crim. App. Feb. 8, 2006) (No Tenn. R. App. P. 11 application filed); *State v. Copeland*, No. 03C01-9402-CR-00079, 1996 WL 368209, at *3 (Tenn. Crim. App. June 28, 1996) (No Tenn. R. App. P. 11 application filed); *State v. Udzinski*, No. 01C01-9212-CC-00380, 1993 WL 473308, at *1 (Tenn. Crim. App. Nov. 18, 1993) (No Tenn. R. App. P. 11 application filed).

The Court of Criminal Appeals' interpretation of Tenn. R. App. P. 3(c)(1) misapprehends the plain language of the rule because it overlooks the word "results." The State may appeal as of right from an order suppressing or excluding evidence only when the substantive effect of that order "results" in the dismissal of the indictment, information, or complaint. When used as a verb, the word "result" means "[t]o arise as a consequence, effect, or conclusion from some action, process, etc." or "to end or conclude in a specified manner." 13 *Oxford English Dictionary* 761 (2d ed. 1989).[11] Thus, to trigger Tenn. R. App. P. 3(c)(1), the order suppressing or excluding the evidence must produce the entry of an order dismissing an indictment, information, or complaint.

Even though the entry of a final order dismissing the indictment, information, or complaint is required for an appeal as of right under Tenn. R. App. P. 3(c)(1), it does not necessarily follow that the State cannot appeal from an order suppressing or excluding evidence when an order of dismissal has not been entered. In the absence of an order of dismissal, the State may still seek interlocutory appellate review of a trial court's order suppressing or excluding evidence using either Tenn. R. App. P. 9 or Tenn. R. App. P. 10. These sorts of appeals from pre-trial rulings in criminal cases are not favored. *State v. Scarborough*, 201 S.W.3d 607, 612 n.2 (Tenn. 2006); *State v. Gilley*, 173 S.W.3d 1, 5 (Tenn. 2005). They address themselves to the courts' discretion, and thus, it is incumbent on the party seeking the appeal – in this case the State – to satisfy the court or courts that there are appropriate grounds for an interlocutory appeal.

Notwithstanding the appellate courts' disinclination to grant appeals under Tenn. R. App. P. 9 and Tenn. R. App. P. 10, the State should be able to carry its burden of persuasion in cases of this sort with little difficulty. When an order suppresses or excludes evidence and thereby eliminates the heart of the State's case, requiring the State to proceed to trial without the suppressed evidence could result in irreparable injury to the public's interest if the accused is acquitted. In that circumstance, the State could not obtain meaningful appellate review of the suppression order because the Double

---

[10]*See*, *e.g.*, *State v. Saine*, No. M2007-01277-CCA-R3-CD, 2008 WL 918511, at *5-6 (Tenn. Crim. App. Apr. 4, 2008); *State v. Copeland*, No. 03C01-9402-CR-00079, 1996 WL 368209, at *3 (Tenn. Crim. App. June 28, 1996) (No Tenn. R. App. P. 11 application filed).

[11]*See also The American Heritage College Dictionary* 1164 (3d ed. 2000) (result means "[t]o come about as a consequence" or "to end in a particular way").

Jeopardy Clauses of the federal and state constitutions[12] would prevent the State from trying the accused a second time. Thus, a suppression order that eliminates any reasonable probability of a successful prosecution provides a basis for an interlocutory appeal under Tenn. R. App. P. 9(a)(1), (3)[13] or an extraordinary appeal under Tenn. R. App. P. 10(a).[14]

A second justification for granting Tenn. R. App. P. 9 or Tenn. R. App. P. 10 appeals from suppression orders arises from the fact that the legal principles relating to searches and seizures and interrogations fluctuate and are heavily fact-dependent. Giving the parties an opportunity for immediate appellate review of suppression orders not only affords them with a chance to obtain review of questionable rulings, but it also decreases the repetition of similar errors by law enforcement officials before the challenged conduct can be reviewed by the courts pursuant to an appeal as of right. *Criminal Procedure* § 27.3(c), at 39-40.

## C.

The entry of the trial court's suppression order on November 9, 2005 was not accompanied by an order dismissing the indictment against Messrs. Meeks and Snyder. Accordingly, the State was not entitled to an appeal as of right under Tenn. R. App. P. 3(c)(1) at that time. It was, however, entitled to pursue a discretionary appeal under Tenn. R. App. P. 9. This is precisely what the State did. However, after the State obtained the trial court's permission to request the Court of Criminal Appeals to hear the interlocutory appeal, it did not file the required application with the intermediate appellate court in the manner required by Tenn. R. App. P. 9(c). Instead, the State apparently abandoned the interlocutory appeal and decided to request dismissal of the indictments against Messrs. Meeks and Snyder and then to pursue an appeal as of right under Tenn. R. App. P. 3(c)(1).

While the wisdom or necessity of the State's tactics might reasonably be questioned, the State's decision to abandon the interlocutory appeal in favor of an appeal as of right does not undermine the State's right to pursue an appeal following the entry of the May 19, 2006 order dismissing the indictments. The Tennessee Rules of Appellate Procedure do not contain an "election of remedies" provision that causes an appellant to forego all other appellate remedies once it decides to pursue one particular appellate remedy. Nor do the Tennessee Rules of Appellate Procedure state that persons who request a Tenn. R. App. P. 9 interlocutory appeal on a particular issue are not

---

[12]U.S. Const. amend. V; Tenn. Const. art. I, § 10.

[13]Interlocutory appeals may be granted under Tenn. R. App. P. 9(a)(1) or (3) to "prevent irreparable injury, giving consideration to the severity of the potential injury, the probability of its occurrence, and the probability that review upon entry of final judgment will be ineffective" and to address questions that "will not otherwise be reviewable upon entry of final judgment."

[14]Extraordinary appeals under Tenn. R. App. P. 10(a) are permitted whenever they are "necessary for complete determination of the action on appeal as otherwise provided in these rules." If a trial court declines to grant a Tenn. R. App. P. 9 interlocutory appeal following the entry of a suppression order that eliminates any reasonable probability of a successful prosecution, the Court of Criminal Appeals may grant an extraordinary appeal if it determines that the State would not otherwise have a meaningful opportunity to obtain appellate review of the suppression order.

entitled to raise that same issue on an appeal as of right if they fail to follow through on the Tenn. R. App. P. 9 interlocutory appeal.

After the State decided against pursuing the interlocutory appeal from the November 9, 2005 suppression order, it requested the trial court to dismiss the indictments against Messrs. Meeks and Snyder, apparently because the District Attorney General had concluded that the suppression of the evidence found in Room 110 eliminated any reasonable probability of a successful prosecution. In its May 19, 2006 order dismissing the indictments, the trial court specifically found that "the suppression of the evidence . . . does present irreparable harm to the State's case in chief." This order is a final order, and, by its own terms, it resulted from the entry of the November 9, 2005 suppression order. Accordingly, following the entry of that order, the State was entitled to an appeal as of right under Tenn. R. App. P. 3(c)(1).

Tenn. R. App. P. 4(a) requires that a notice of appeal must be filed within thirty days after the date of the entry of the judgment appealed from. The State filed its notice of appeal in this case on June 16, 2006. This notice of appeal was timely because it was filed within thirty days after the entry of the May 19, 2006 order dismissing the case against Messrs. Meeks and Snyder. In light of the fact that the State's notice of appeal was timely filed, this case did not require the Court of Criminal Appeals to exercise its discretion under Tenn. R. App. P. 4(a) to excuse the State from the timely filing of a notice of appeal. Therefore, the arguments by Messrs. Meeks and Snyder regarding the propriety of the Court of Criminal Appeals' invocation of its power under Tenn. R. App. P. 4(a) to excuse the State from filing a timely notice of appeal are without merit.

## III.

Messrs. Meeks and Snyder also assert that the Court of Criminal Appeals erred by reversing the trial court's November 9, 2005 suppression order. While they concede that the law enforcement officers had probable cause on the evening of March 6, 2005 to enter Room 110 at the Park Motel, they insist that the officers were not confronted with exigent circumstances sufficient to justify entering the room before obtaining a search warrant. We disagree. The circumstances of this case provide a textbook example of the sort of exigent circumstances that require immediate action by law enforcement officers.

## A.

In reviewing suppression rulings, the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court as a fact-finder. *State v. Scarborough*, 201 S.W.3d at 615. When a trial court makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them. *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007). A trial court's conclusions of law are reviewed de novo without any presumption of correctness. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006). The question of whether circumstances were sufficiently exigent to justify a warrantless search is a mixed question of law and fact. *See*, *e.g.*, *United States*

*v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006); *United States v. Russell*, 436 F.3d 1086, 1089 n.2 (9th Cir. 2006); *United States v. Davis*, 290 F.3d 1239, 1241 (10th Cir. 2002). Review of mixed questions of law and fact is de novo without any presumption of correctness. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006); *State v. Rogers*, 188 S.W.3d 593, 629 (Tenn. 2006).

**B.**

Both the Constitution of the United States and the Constitution of Tennessee prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7. Thus, as a general matter, law enforcement officials cannot conduct a search without having first obtained a valid warrant. *California v. Carney*, 471 U.S. 386, 390 (1985); *R.D.S. v. State*, 245 S.W.3d 356, 365 (Tenn. 2008).

However, because the contours of these constitutional protections are shaped by the concept of "reasonableness," the courts have recognized exceptions to the general requirement of the issuance of a warrant prior to conducting a search. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *State v. Scarborough*, 201 S.W.3d at 616-17. Among the commonly recognized exceptions to the requirement of a warrant are: (1) a search incident to an arrest, (2) the plain view doctrine, (3) a consent to the search, (4) a *Terry*[15] stop and frisk, and (5) the existence of exigent circumstances. *State v. Berrios*, 235 S.W.3d at 104; *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005). Where a warrantless search is conducted, the government bears the burden of demonstrating that the search was conducted pursuant to one of the exceptions to the warrant requirement. *Vale v. Louisiana*, 399 U.S. 30, 34 (1970); *State v. Hayes*, 188 S.W.3d 505, 511 (Tenn. 2006).

This appeal focuses on the exigent circumstances justification for a warrantless search. Exigent circumstances arise where "the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. at 403 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). Given the importance of the warrant requirement in safeguarding against unreasonable searches and seizures, a circumstance will be sufficiently exigent only where the State has shown that the search is imperative. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Hayes*, 188 S.W.3d at 514; *State v. Yeargan*, 958 S.W.2d 626, 641 (Tenn. 1997) (Reid, J., concurring). Although not an exclusive list, the following are frequently-arising situations that have been found to be sufficiently exigent to render a warrantless search of a domicile reasonable: (1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury.[16] *Brigham City, Utah v. Stuart*, 547 U.S. at 403;

---

[15]*Terry v. Ohio*, 392 U.S. 1 (1968).

[16]Professor LaFave has counseled that "[t]hough this 'emergency aid exception' is one of many 'community caretaking functions' of the police, it must be assessed separately and by a distinct test, as all such functions are not 'judged by the same standard;' moreover, they must be distinguished from 'the exigent circumstances exception.'" 3

(continued...)

*Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005).

Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant.[17] Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant.[18] The exigency of the circumstances is evaluated based upon the totality of the circumstances[19] known to the governmental actor at the time of the entry.[20] Mere speculation is inadequate;[21] rather, the State must rely upon specific and articulable facts[22] and the reasonable inferences drawn from them.[23] The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant.[24] The manner and the scope of

[16](...continued)
Wayne R. LaFave, *Search and Seizure* § 6.6(a) n.6, at 451 (4th ed. 2004). The United States Supreme Court, however, in *Brigham City, Utah v. Stuart* 547 U.S. at 402-03, embedded the emergency aid exception deep within the exigent circumstance exception to the warrant requirement. *See*, *e.g.*, *United States v. Snipe*, 515 F.3d 947, 951-52 (9th Cir. 2008); *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

[17]*State v. Inghram*, No. M2006-00818-CCA-R3-CD, 2007 WL 2011132, at *4 (Tenn. Crim. App. July 11, 2007) (No Tenn. R. App. P. 11 application filed); *see also*, *e.g.*, *DeMayo v. Nugent*, 517 F.3d 11, 15 (1st Cir. 2008); *McClish v. Nugent*, 483 F.3d 1231, 1240-41 (11th Cir. 2007); *United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998).

[18]*State v. Davis*, No. M2004-03060-CCA-R3-CD, 2005 WL 2255968, at *5-6 (Tenn. Crim. App. Sept. 15, 2005) (No Tenn. R. App. P. 11 application filed); *State v. McCall*, 698 S.W.2d 643, 650 (Tenn. Crim. App. 1985); *see also, e.g., United States v. Bell*, 500 F.3d 609, 613 (7th Cir. 2007).

[19]*State v. Davis*, 2005 WL 2255968, at *4-7; *see also*, *e.g.*, *United States v. Atchley,* 474 F.3d 840, 850 (6th Cir. 2007); *United States v. Maldonado*, 472 F.3d 388, 395 (5th Cir. 2006).

[20]*State v. Davis*, 2005 WL 2255968, at *6; *see also, e.g., United States v. Brown*, 449 F.3d 741, 745 (6th Cir. 2006); *United States v. Hernandez Leon*, 379 F.3d 1024, 1029 (8th Cir. 2004).

[21]*Bailey v. Newland*, 263 F.3d 1022, 1033 (9th Cir. 2001); *United States v. Anderson*, 154 F.3d 1225, 1234 (10th Cir. 1998).

[22]*State v. Lovell*, No. M2002-02379-CCA-R3-CD, 2003 WL 22142499, at *6 (Sept. 17, 2003) (No Tenn. R. App. P. 11 application filed); *see also, e.g., United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000); *State v. Warren*, 949 So. 2d 1215, 1225 (La. 2007).

[23]*State v. Inghram*, 2007 WL 2011132, at *5; *see also*, *e.g.*, *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985); *State v. Eberly*, 716 N.W.2d 671, 679 (Neb. 2006); *Howe v. State*, 916 P.2d 153, 159 (Nev. 1996).

[24]*See*, *e.g.*, *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1028 (8th Cir. 2007); *State v. Shriner*, ___ N.W.2d ___, ___, 2008 WL 2229490, at *4 (Minn. 2008).

The United States Supreme Court, interpreting the Fourth Amendment to the United States Constitution,
(continued...)

the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone.[25] Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.[26]

## C.

Methamphetamine laboratories are regarded as highly dangerous. *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008); *United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002). In 2000, the United States House of Representatives explained:

> The methamphetamine epidemic in America differs in kind from the threat of other illegal drugs because methamphetamine can be made from readily available and legal chemicals and substances, and because it poses serious dangers to both human life and the environment. Additionally, these chemicals and substances are utilized in a manufacturing process that is unstable, volatile, and highly combustible. Even small amounts of these chemicals, when mixed improperly, can cause explosions and fires. For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks, or sewage systems in an effort to conceal evidence of illegal manufacturing. More disturbing is that most of these laboratories are situated in

---

[24](...continued)
determined that subjective motivation is irrelevant even with regard to the emergency aid exception. *Brigham City, Utah v. Stuart*, 547 U.S. at 404. Insofar as this exception can reach beyond criminal investigatory purposes to broader "community caretaker" police activities, the Tennessee Court of Criminal Appeals has sounded a cautionary note. In response to the State's assertion that it was exercising its community caretaker function, Judge Williams stated that "[s]uch actions are justifiable and laudable so long as the aid is actually needed or sought by the citizen. Otherwise, it is merely a guise for unwanted official intrusion into the privacy of the affected citizen." *State v. Waters*, No. M2006-01468-CCA-R3-CD, 2007 WL 2744996, at *4 (Tenn. Crim. App. Sept. 21, 2007) (No Tenn. R. App. P. 11 application filed). Whether the constitutional protections afforded by Tenn. Const. art. I, § 7 are any broader in terms of not allowing police officers when acting in a community caretaker, rather than a criminal law enforcement, role to knowingly and purposefully use the emergency aid exception as a criminal investigation tool is not an issue before this Court but may in subsequent cases warrant consideration.

[25]*Mincey v. Arizona*, 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. at 25-26) (indicating that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation'"); *United States v. Najar*, 451 F.3d at 718, 720; *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 550 (6th Cir. 2003).

[26]*See, e.g., United States v. Snipe*, 515 F.3d at 951-52; *United States v. Layman*, 244 Fed. Appx. 206, 210 (10th Cir. 2007); *United States v. Huffman*, 461 F.3d at 783; *United States v. Williams*, 354 F.3d 497, 505 (6th Cir. 2003).

residences, motels, trailers, and vans, and often times are operated in the presence of children.

H.R. Rep. No. 106-878, Part I, at *22 (Sept. 21, 2000).[27]  In addition to being highly combustible,[28] the vapors or fumes that are generated in the production of methamphetamine pose further dangers. For example, exposure to the toxic fumes or vapors produced during the manufacture of methamphetamine, some of which are carcinogenic, can cause serious inhalation injuries to those at the laboratory site and sometimes even to neighbors.[29]

The hazards posed by an actively operating methamphetamine laboratory are so significant that a number of state and federal courts have determined that the discovery of an actively operating methamphetamine laboratory, in and of itself, creates an exigent circumstance justifying immediate action without the attendant delays that accompany obtaining a search warrant. *See*, *e.g.*, *United States v. Lloyd*, 396 F.3d 948, 954 (8th Cir. 2005); *Williams v. State*, No. CR-06-1752, 2008 WL 2223068, at *6 (Ala. Crim. App. May 30, 2008); *Barth v. State,* 955 So.2d at 1118; *State v. White*, 886 N.E.2d 904, 911 (Ohio Ct. App. 2008).  Other courts that have recognized the dangers of actively operating methamphetamine laboratories have stopped short of adopting a per se rule. Rather, they have based their finding of exigency on the location of the particular laboratory. *United*

---

[27] *See* http://www.congress.gov/cgi-bin/cpquery/R?cp106:FLD010:@1(hr878) (last visited July 30, 2008).  This House Report was issued with regard to the Methamphetamine and Club Drug Anti-Proliferation Act of 2000 which was enacted as Section 3612 of the Methamphetamine Anti-Proliferation Act of 2000, Pub. L. No. 106-310, 114 Stat. 1101.

[28] Approximately fifteen percent of all methamphetamine laboratories that are discovered in the United States are found as a result of an explosion or fire.  *See* Dep't of Justice, *Dangers to Children Living at Meth Labs*, *available at* http://www.ojp.usdoj.gov/ovc/publications/bulletins/children/pg5.html (last visited July 30, 2008) ("*Dangers to Children Living at Meth Labs*").  The Tennessee General Assembly has even imposed a reporting requirement on hospitals, clinics, sanitariums, doctors, physicians, surgeons, nurses, pharmacists, undertakers, embalmers, and other persons called upon to render aid to persons suffering from any wound or other injury to report when the injury or wound results from exposure to a methamphetamine laboratory or a methamphetamine laboratory-related fire, explosion, or chemical release.  Tenn. Code Ann. § 38-1-101(a) (2006).  *See also* http://www.methfreetn.org/meth101/recipe_for_disaster.php (last visited July 30, 2008) ("Making meth can be as dangerous as taking it.  Meth lab explosions shatter buildings, burning and incinerating everything in sight.  Why? Meth's ingredients contain a hazardous combination of poisonous and flammable chemicals, which are heated on a stove or hot plate.  A slight miscalculation with ingredients or cooking temperature, and meth becomes a deadly bomb.")

[29] *See generally United States v. Layne*, 324 F.3d 464, 470 (6th Cir. 2003); *Barth v. State,* 955 So. 2d 1115, 1118 (Fla. Ct. App. 2006); Centers for Disease Control & Prevention, *Public Health Consequences Among First Responders to Emergency Events Associated with Illicit Methamphetamine Laboratories - Selected States, 1996-1999*, 49 Morbidity & Mortality Wkly. Rep. 1021, 1023 (2000), *available at* http://www.cdc.gov/mmwr/pdf/wk/mm4945.pdf (last visited July 30, 2008); *Dangers to Children Living at Meth Labs*, *supra* note 32; Wis. Dep't of Health and Family Servs., *Cleaning Up Hazardous Chemicals at Former Meth Labs*, *available at* http://dhfs.wisconsin.gov/eh/ChemFS/fs/MethClnUp.htm (last visited July 30, 2008); Wyo. Dep't of Health, *Cleaning Up Hazardous Chemicals at Methamphetamine Laboratories*, *available at* http://wdh.state.wy.us/phsd/epiid/methcleanup.html (last visited July 16, 2008); Jean C. O'Connor et al., *Developing Lasting Legal Solutions to the Dual Epidemics of Methamphetamine Production and Use*, 82 N.D. L. Rev. 1165, 1172 (2006); Anna S. Vogt, Note, *The Mess Left Behind: Regulating the Cleanup of Former Methamphetamine Laboratories*, 38 Idaho L. Rev. 251, 258-60 (2001).

*States v. Atchley*, 474 F.3d 840, 851 n.6 (6th Cir. 2007); *State v. Chapman*, 813 P.2d 557, 560-61 (Or. Ct. App. 1991). These courts have focused on whether there were people in the vicinity of the actively operating methamphetamine laboratory, notably neighbors, law enforcement officials, and those manufacturing the methamphetamine. *United States v. Atchley*, 474 F.3d at 851; *State v. Simmons*, 714 N.W.2d 264, 273-74 (Iowa 2006); *Bishop v. Commonwealth*, 237 S.W.3d 567, 570 (Ky. Ct. App. 2007). Regardless of the approach taken, whether a per se rule or a determination based upon the presence of others in the vicinity, the scope of a permissible warrantless search remains limited to the scope of the exigency. *United States v. Layman*, 244 Fed. Appx. at 211; *State v. Bilynsky*, 932 A.2d 1169, 1176 (Me. 2007); *Coffey v. State*, 99 P.3d 249, 252 (Okla. Crim. App. 2004).[30]

**D.**

There is no issue in this case regarding the law enforcement officers having probable cause to believe that the occupants of Room 110 at the Park Motel were actively manufacturing methamphetamine in their room on the evening of March 6, 2005.[31] Messrs. Meeks and Snyder concede that they did.

The undisputed facts clearly establish the sort of exigent circumstances that justified the officers' decision to enter Room 110 of the Park Motel without first obtaining a search warrant. They knew that an actively operating methamphetamine laboratory posed a serious danger not only to the persons in the room itself but also to all persons in the immediate vicinity. The distinct odor

---

[30]This case does not require us to address the legality of a warrantless search of an actively operating methamphetamine laboratory where the sole of risk of danger is to the persons who are actually manufacturing the methamphetamine or where there is a significant delay between the time the law enforcement officers had probable cause to believe they had discovered an actively operating methamphetamine laboratory and the time the officers conducted the warrantless search. Neither of these circumstances are present in this case.

[31]In addition to the existence of an exigent circumstance, the search generally must also be supported by probable cause. *Kirk v. Louisiana*, 536 U.S. 635, 637 (2002); *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005); *State v. Henning*, 975 S.W.2d 290, 300 (Tenn. 1998); *see also R.D.S. v. State*, 245 S.W.3d at 366 n.4 (noting that one of the primary exceptions to the warrant requirement is "probable cause to search with exigent circumstances"). Interpreting the Fourth Amendment, the United States Supreme Court ruled in 2006 that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. at 403. Notably, absent from the Supreme Court's analysis was any reference to the existence of probable cause. Bruce A. Antkowiak, *Saving Probable Cause*, 40 Suffolk U. L. Rev. 569, 575 (2007); Ricardo J. Bascuas, *Fourth Amendment Lessons From the Highway and the Subway: A Principled Approach to Suspicionless Searches*, 38 Rutgers L.J. 719, 778-79 (2007). The Supreme Court "failed to conduct any traditional probable cause inquiry. Instead, the Court assumed that probable cause to associate the emergency with the place to be searched exists whenever law enforcement officers have an objectively reasonable basis for concluding that an emergency is unfolding in that place." *United States v. Snipe*, 515 F.3d at 952; *United States v. Najar*, 451 F.3d at 718 (10th Cir. 2006) (noting that the Court did not "require probable cause in this type of exigent circumstances"). In considering the emergency aid exception under the Fourth Amendment, probable cause is not a necessary element. The inter-relationship between probable cause and the various permutations of the emergency aid exception under Article I, Section 7 of the Tennessee Constitution is not before the Court in the present case but may warrant consideration in future cases.

surrounding Room 110, the intensity and strength of the odor, the fumes emanating from Room 110, and the effects of the odor and fumes on the inhabitants of Room 109 provided the officers with enough facts to believe that the persons in Room 110 were actively manufacturing methamphetamine. This conclusion provided the officers with an objectively reasonable basis for concluding that there was an immediate need to act to protect themselves and others from serious harm. The fact that the officers overlooked clearing the adjoining rooms before they entered Room 110 does not undermine the reasonableness of their decision to enter Room 110 without waiting for a search warrant. Accordingly, the officers' warrantless entry into and search of Room 110 was not an unreasonable search under either the Fourth Amendment to the United States Constitution or Article I, Section 7 of the Constitution of Tennessee.[32]

## IV.

The judgment of the Court of Criminal Appeals reversing the trial court's November 9, 2005 order suppressing the evidence found in Room 110 and vacating the order dismissing the indictments is affirmed, and the case is remanded for further proceedings consistent with this opinion. Because Messrs. Meeks and Snyder are indigent, the costs of this appeal shall be paid by the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE

---

[32]Messrs. Meeks' and Snyder's argument that *State v. Carter*, 160 S.W.3d 526 (Tenn. 2005) requires a finding that this search was unreasonable is unpersuasive. *State v. Carter* did not require this Court to address the pivotal question raised in this case – whether an actively operating methamphetamine laboratory provides a sufficiently exigent circumstance to justify a warrantless entry into the place where the laboratory was located. In *State v. Carter*, the State argued that destruction of evidence, an exigent circumstance created by the police officers themselves, justified the warrantless entry. The State did not argue that the officers acted in response to the risk posed to the officers or others from the methamphetamine manufacturing process. Nor did the State present evidence indicating that the officers were aware at the time of entry of the dangers posed by the active manufacturing of methamphetamine. *See generally State v. Carter*, 160 S.W.3d 526; *State v. Carter*, No. W2002-00947-CCA- R3-CD, 2003 WL 22213225 (Tenn. Crim. App. Sept. 24, 2003).