# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 22, 2015 Session

## STATE OF TENNESSEE v. MALIK HARDIN

**Appeal from the Criminal Court for Knox County**
**No. 101617A      Bob R. McGee, Judge**

---

**No. E2014-00873-CCA-R3-CD – Filed June 12, 2015**

---

The defendant, Malik Hardin, pleaded guilty to possession with intent to sell less than 0.5 grams of cocaine in a drug free school zone, possession of a firearm during the commission of a dangerous felony, simple possession of a controlled substance, and criminal trespass.  He received a total effective sentence of fifteen years to be served at 100 percent.  As part of his guilty plea, the Defendant sought to reserve two certified questions of law: (1) whether the defendant's arrest for the offense of criminal trespass was "objectively reasonable" under the Fourth and Fourteenth Amendments to the United States Constitution and article I, section 7 of the Tennessee Constitution in light of the "cite and release" rule codified at Tennessee Code Annotated section 40-7-118(b)(1); and (2) whether the seizure of the Defendant's automobile was based upon reasonable suspicion that the automobile was or contained evidence or fruits of criminal activity, and whether there was "reasonable cause" to believe that impoundment was "reasonably necessary" under the circumstances.  Following our review, we conclude that the defendant's custodial arrest for criminal trespass was not in contravention of Tennessee Code Annotated section 40-7-118 and that the trial court did not err in failing to suppress evidence seized subsequent to the defendant's arrest.  The judgments of the trial court are, therefore, affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., joined.  D. KELLY THOMAS, JR. J., filed a separate dissenting opinion.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Malik Hardin.

Herbert H. Slatery III, Attorney General & Reporter; Lacy Wilber, Senior Counsel; Charme P. Allen, District Attorney General; and Philip H. Mortin and Jennifer Hoffmesiter Welch, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On March 22, 2011, the defendant was indicted for possession with intent to sell or deliver cocaine, possession of a firearm during a dangerous felony, unlawful possession of a weapon, simple possession of a controlled substance, and criminal trespass. Thereafter, the defendant filed a motion to suppress any evidence gathered as a result of his arrest and the subsequent seizure of his automobile. A suppression hearing was held on April 26, 2012.

In the hearing, the evidence showed that, on May 5, 2010, Knoxville Police Department ("KPD") Officers Brandon Wardlaw and Sergeant Christopher Bell were on a "walking patrol" on West New Street in the Austin Homes Housing Development ("Austin Homes"). The area the officers were patrolling was property of Knoxville Community Development Corporation ("KCDC"). Officer Wardlaw saw a Chevrolet Impala enter Austin Homes and recognized the passenger in the car, Chancey Johnson. Officer Wardlaw knew that Johnson was on a "no trespass" list for KCDC property and informed Sergeant Bell of the situation. Sergeant Bell got in his vehicle and followed the Impala to a parking lot while Officer Wardlaw went to the lot on foot. Sergeant Bell informed Officer Wardlaw that the defendant had walked to the back of a nearby building and instructed Officer Wardlaw to "[g]o around there and talk to him." Officer Wardlaw met the defendant behind the building and asked the defendant for identification. According to Officer Wardlaw, the defendant told him that he did not have identification, that he was on parole, and that he was "on KCDC trespass."

Officer Wardlaw asked to search the defendant, and the defendant consented. The search of the defendant's person revealed two cell phones and "a large bundle of money . . . in a stack" with "rubber bands on it." Officer Wardlaw "left everything in [the defendant's] pockets" and walked with the defendant to the front of the building.

At some point, Officer Wardlaw asked the defendant whether he had keys to the vehicle, and the defendant responded that he did not. Officer Wardlaw then looked in the vehicle but could see nothing in the car at the time. Sergeant Bell looked inside the

vehicle and said, "If you look right there you can see the butt of a handgun." Officer Wardlaw again looked inside the car, and this time he saw the butt of a handgun.

According to Officer Wardlaw, the Impala's doors were locked, and the defendant denied having keys to the car. At that time, the officer requested a police dog, and when the dog was brought to the scene he reacted positively to the car. The officers then began the process to obtain a search warrant for the vehicle.

Officer Wardlaw testified that he had discretion to arrest the defendant rather than issue a citation and release him and that in this particular case, he relied upon the statutory exception that allows for an arrest when it is likely that the offense, in this case criminal trespass, will continue. Additionally, Officer Wardlaw testified that while he and the other officers were discussing what to do about the car, a female, later identified as Latonya Bowman, approached them and asked to take possession of the car. Officer Wardlaw testified that he told Ms. Bowman to "[s]tep back" and that he would "get back with her." He did not talk to her again, however, because he was busy. He agreed that at the time, the police were unwilling to release the vehicle to anyone because it was under investigation. Officer Wardlaw could not recall whether Ms. Bowman asked to take the car before or after Sergeant Bell saw the gun.

Contrary to his earlier testimony, Officer Wardlaw admitted on cross-examination that he had previously testified[1] that the defendant did in fact have his driver's license with him when the officer first approached the defendant. Officer Wardlaw agreed that his prior testimony was correct because the incident "was probably fresher on [his] mind" at the time. He further admitted that in his prior testimony he stated that he did not see the dog react positively on the car, and he agreed that his earlier testimony differed from his testimony on direct examination.

On redirect examination, Officer Wardlaw testified that the Impala was registered to a rental car company and that generally when a person wants a rental car "released," officers are "only supposed to release it to the owner of the vehicle, whoever's name it's in unless you have written permission from that person." He testified that the police could confirm the name of the person who rented the car by either looking at a copy of the rental contract or by contacting the rental company. Officer Wardlaw also testified that he was not aware that Ms. Bowman was the person who had

_____

[1] Officer Wardlaw was deposed in a related civil forfeiture case wherein the Defendant sought to reclaim some of the money seized as a result of the vehicle search.

-3-

rented the vehicle. He admitted that he could have been mistaken about his testimony about the dog's reaction because "it's been over two years, and a lot has happened between that." He clarified that it was his "understanding" that the dog reacted because "[the dog] was given a reward and positive affirmation from the handler, and that's what led me to believe [the dog] . . . did his job."

KPD Sergeant Josh Shaffer testified that on May 5, 2010, Sergeant Bell contacted him and apprised him of the situation at Austin Homes. Sergeant Shaffer then went to the Austin Homes to assist with the investigation of the vehicle. When he arrived at the scene, the Impala was parked in a parking space "at the dead end of West New." Sergeant Shaffer spoke with the other officers at the scene and then looked in the front windshield of the car where he saw "the handgrip and butt end of a semiautomatic handgun and an extended magazine as well." Sergeant Shaffer was familiar with the defendant and knew that he was on parole for a drug crime. After further discussion with the officers, Sergeant Shaffer ascertained that Officer Sean Peoples had already responded to the scene with his police dog. Sergeant Shaffer spoke with Officer Peoples who informed him that his dog had conducted a sniff of the exterior of the vehicle and that the dog had reacted positively.

At that time, Sergeant Shaffer decided to apply for a search warrant. He testified that even if the defendant had been issued a citation rather than arrested, he still would have retained the car in order to get a search warrant. Sergeant Shaffer said even if he had not been applying for a search warrant, he would not have allowed anyone to take the car from the scene.

Sergeant Shaffer obtained a search warrant, and an officer sealed the car doors with evidence tape at the scene to ensure the vehicle was not tampered with during its transport to the city impound lot, where the search was eventually conducted. The search of the Impala revealed a loaded Ruger pistol, a Tupperware container that contained marijuana, crack and powder cocaine, and a computer case containing a laptop and approximately $20,000 in cash. The officers discovered the defendant's fingerprint on the Tupperware container holding the drugs.

On cross-examination, Sergeant Shaffer agreed that the officers on the scene relayed the following timeline of events to him: the officers saw the Impala and called for a drug dog; the dog arrived and reacted to the car; and an officer then noticed the handgun inside the car. Shaffer testified that when a person is arrested, generally the arrestee's car may be released to someone else with the owner's permission. With respect to a rental car, Sergeant Shaffer testified that, in the past, he has contacted the

rental company and asked what they would like the police to do with the car, and he would allow he renter to take the car "[u]nless there's some type of evidentiary value, obviously . . . ." Sergeant Shaffer testified that he did not know whether anyone contacted the rental company in this particular case, that he was not sure whether the officers at the scene even knew that the vehicle was a rental car at the time, and that he did not know the car was a rental until he searched the vehicle. When he arrived at the scene, no one told him the car was a rental.

Sergeant Shaffer testified that the car was registered to E.A.N. Holdings and stated that "only are you [sic] familiar with rental cars do you understand what that company is." Sergeant Shaffer testified that the rental agreement was found in the glove box and that, until then, no one had seen the agreement to verify whether the defendant's name was on the agreement. Additionally, he was not able to identify which rental company the car belonged to until he found the agreement.

The defense called KPD Officer Christopher Whitfield who testified that he assisted with the defendant's arrest and that he was the affiant on the arrest warrant. Additionally, Officer Whitfield searched the defendant while placing him under arrest for criminal trespass. The defendant asked Officer Whitfield if he could give his property to a female at the scene, and the officer gave him permission to do so. Officer Whitfield testified that the defendant gave the female a cell phone, a large amount of money, and a set of keys. Officer Whitfield could not recall the name of the woman who took the defendant's property, and he testified that the woman did not tell Officer Whitfield that she was the owner of the car. According to Officer Whitfield, he did not believe there was anything "untoward or inappropriate" about the defendant's possessions at that time. He agreed, however, that he was a new officer at the time of the defendant's arrest and that he would probably not allow similar items to be transferred to a bystander if the same situation occurred again.

Officer Whitfield testified that because criminal trespass is a misdemeanor, when he applied for the arrest warrant, he was required to set forth one of the statutory exceptions that allows for an arrest rather than the issuance of a citation. In this case, Officer Whitfield relied on the exception that allows for an arrest when it is likely that the offense will continue. According to Officer Whitfield, he relied upon this exception because the defendant knew he was on the KCDC no-trespass list and "was knowingly on KCDC property." The officer was concerned that if he merely issued the defendant a citation, "[h]e may leave for a moment, sir, but he still had the ability to return to the scene . . . ." Furthermore, Officer Whitfield testified that the offense would necessarily

continue because the defendant would have been issued the citation while on KCDC property.

Next, the Defendant called KPD Sergeant Christopher Bell to testify. Sergeant Bell testified that on May 5, 2010, he was working as a patrol sergeant in Austin Homes. As the patrol sergeant, Sergeant Bell was "in charge of" Officers Wardlaw and Whitfield. On that day, Sergeant Bell "came into contact with" the defendant and Mr. Johnson, both of whom he knew to be on the KCDC no-trespass list. He testified that he did not see the men until they had already parked the Impala and were exiting the vehicle. He agreed that the Impala was "properly parked" and that the parking spaces at the housing development were not reserved.

Sergeant Bell testified that the car was seized before the dog reacted to the vehicle and that he would not have allowed anyone to remove the car from the scene; however, he subsequently testified that "[t]he vehicle was under investigation before a K-9 arrived. The vehicle was not seized until after the K-9 alerted on the vehicle." After defense counsel played a portion of Sergeant Bell's testimony from the preliminary hearing, Sergeant Bell again testified that the vehicle was under the "control" of the police before the dog arrived, and he further testified that he did not see the gun until after the dog arrived. Sergeant Bell agreed with the following sequence of events: the defendant was arrested; a dog was brought to the scene; the dog reacted to the car; Sergeant Bell saw the gun in the car; Sergeant Shaffer arrived; and the car was towed to the impound lot.

When asked whether anything suspicious about the car occurred before the dog arrived, Sergeant Bell responded that "[the defendant and Mr. Johnson] had driven the vehicle upon to [sic] KCDC property and that they were trespassing. But, no, there was nothing that was odd about the vehicle." Defense counsel then asked Sergeant Bell whether anything indicated that evidence of a crime was in the vehicle prior to the dog's arrival. Sergeant Bell answered:

Well, I can say that both of these individuals getting out of the vehicle and putting distance between them and that vehicle was odd to me. They didn't attempt to run[,] to flee[,] to get away from me or the other officers, but they did want to put distance between them and the vehicle. That was odd.

And secondly, when I asked [the defendant] if he had the keys to the vehicle, he denied possessing the vehicle, which I thought was odd also.

According to Sergeant Bell, no one at the scene claimed ownership of the Impala or asked to take possession of the car. The defendant told the officers that "he didn't have a vehicle." After running a records check on the vehicle, officers determined that the vehicle was a rental car.[2] Sergeant Bell agreed that "KPD had no policy just to release a rental car to anybody . . . ." Ordinarily, a rental car could be released to either the rental car company or to the person who had leased the vehicle. Sergeant Bell testified that the officers could not determine who was on the rental contract because the Impala's doors were locked. He did, however, assume that the vehicle did not belong to the defendant because the defendant denied possessing the keys. Sergeant Bell testified that he could not ask the defendant about the car's ownership because the defendant had invoked his right to remain silent.

Sergeant Bell later testified that even if the defendant had not been arrested for criminal trespass, he still would have called for a dog and kept the Impala for investigation because of the defendant's prior drug history, his possession of "the money and the cell phones," his presence in an area known for drug sales, and the fact that the defendant himself was known to sell drugs in that area. Sergeant Bell explained that, "[i]n [his] mind if there was nothing in the vehicle then [the defendant] would have said, yeah, go ahead and look. But [the defendant] said, 'I don't have a car.' I found it very odd." Sergeant Bell stated that the defendant was a parolee, and when asked whether parolees can be searched as a part of their parole agreement, he responded, "I believe so, yes." He also agreed that a parolee's vehicle can be searched without a warrant.

Latonya Bowman testified that she rented a car from Enterprise in May 2010 and that she allowed the Defendant to drive that car because his car was "broke down." Caressa[3] contacted her on May 5, 2010 and told her that the police had the car. Ms. Bowman said she immediately headed to the scene because the car was in her name. She was concerned that the police would take possession of the vehicle and that

---

[2] From Sergeant Bell's testimony, it is unclear at what point officers determined that the Impala was a rental car.

[3] Although not testified to by Ms. Bowman, from the record it appears that "Caressa" was the Defendant's then fiancée. Her name is spelled "Carissa" in the transcripts, but we have chosen to adopt the spelling she used when signing her name on documents in the record. The witnesses refer to her only by her first name.

Enterprise would charge her extra if the car was not returned on time. Upon her arrival, she obtained the keys to the Impala from Caressa and then asked an officer if she could take the car. The officer told her to "back up." Ms. Bowman testified that she tried to explain that the car belonged to her, but the police would not discuss the matter with her. According to Ms. Bowman, she told the officers that the car was in her name and that she had the keys. She testified that this exchange occurred before the drug dog arrived on the scene.

Ms. Bowman testified that she rented the car because Caressa did not have a debit card and that this was the first time she had rented a car for Caressa. Ms. Bowman denied telling Sergeant Shaffer than she had rented cars for Caressa in the past. She claimed that she was not aware of the contents of the car. Ms. Bowman agreed that she lied to the rental company when she told them that she would be the only person driving the car.

Michelle Johnson testified that she was married to Chancey Johnson and that the defendant was "[a] close friend of [her] family." She recalled that on May 5, 2010, she attended a birthday party at her mother's house on Nelson Street in Austin Homes, "right around the corner" from West New Street. She testified that both the Defendant and her husband were invited to the party. Ms. Johnson was outside when she saw the defendant and her husband "sitting on the porch . . . probably about to go in custody."

Ms. Johnson remembered seeing Ms. Bowman, with whom she was acquainted, "g[e]t her keys from Caressa" at the scene. Ms. Johnson testified that Ms. Bowman "tried to go to her car," which Ms. Johnson described as a gray Impala. However, Sergeant Bell told Ms. Bowman to "step back away from the car." Ms. Johnson testified that Ms. Bowman repeatedly told the officers that the Impala was her car and that she wished to leave with the vehicle but that the officers refused her access to the car. According to Ms. Johnson, this interaction occurred before the dog arrived. Ms. Johnson heard Sergeant Bell tell the other officers that no one was going to move or take the car. Ms. Johnson also testified that Sergeant Bell was "very upset" with two or three of the other officers because Ms. Bowman had the keys to the car and was trying to gain access to it.

Ms. Johnson testified that both her husband and the defendant were convicted felons and that a condition of both men's release was that they were not

allowed to be with other convicted felons. She denied knowing that either man was on the KCDC no-trespass list.

According to Ms. Johnson, Ms. Bowman was driving the Impala on May 4, 2010, in the Austin Homes area. Ms. Johnson also saw Ms. Bowman driving the car "[a] day or two before that." She clarified that Ms. Bowman walked toward the Impala to take the car when Sergeant Bell stopped her. She denied seeing Ms. Bowman approach or talk to Officer Wardlaw or any other officer on the scene. Ms. Johnson testified that she was not aware that the Impala was a rental car, that she had seen Ms. Bowman "with [the car] a couple of days," and that she had also seen Ms. Bowman drive other cars.

The defendant testified for the limited purpose of establishing standing. The defendant testified that he was driving the Impala on May 5, 2010, and that he got the car from Ms. Bowman, who allowed him and Caressa to drive it. He testified that he knew Ms. Bowman through his wife, Caressa. The defendant paid Ms. Bowman around $600 to use the vehicle. He testified that he also had possession of the car on May 4. The defendant knew that the car was rented in Ms. Bowman's name, but he claimed that, at the time, he was not aware that it was a violation of the rental contract for him to drive the car. The defendant further testified that he did not tell the police that the Impala was a rental car because they never asked. According to the defendant, he called Caressa prior to his arrest and told her that he was being arrested and to make arrangements with Ms. Bowman to retrieve the vehicle.

The Defendant explained that when he was arrested, Officer Whitfield conducted a pat-down search and felt the keys in the defendant's pocket, and the defendant asked whether he could "pass" his keys, phone, and money to Stephanie Ross. The defendant testified that his intent was to "preserve [his] expectation of privacy. And not have an illegal search." He instructed Ms. Ross to give the items to Caressa when she arrived on the scene. He did not recall telling Sergeant Bell that the car was not his but did recall Sergeant Bell's asking whether he had keys to the car. He explained that he denied having car keys because he had already given them to Ms. Ross. The defendant stated that he was never asked to "claim" the vehicle and that he did not proffer any information about the car because he had invoked his right to remain silent.

After the defense rested, the State argued that the defendant had not proven that he had standing to challenge the search because the defendant had no contractual or legal right to the car, he denied ownership of the vehicle, and he gave the car keys to another person. The trial court disagreed and determined that the defendant did have standing to challenge the search, but it determined that "the proof he's offered makes it

-9-

clear that he cannot complain that the police at the time failed to recognize his standing because he did his best to dissociate himself from the vehicle by his own testimony."

The trial court then addressed the defendant's challenge to his arrest. The court found that "the circumstances when objectively considered do indicate and support and justify the officer's decision to arrest because of . . . a reasonable likelihood that the offense would continue or resume." The court based this decision on the following:

> There is, of course, the facile observation that if he was served with a citation right there he would still be on KCDC property and still be in violation, but skipping beyond that, the [c]ourt would – this [c]ourt would find that the officer at that point had these things he could consider, that the [d]efendant was on the KCDC no trespassing list. That he knew he was on that list. But nevertheless he blithely came right onto the property, no hesitation. He would know that the reasons for coming onto that property are social events, and apparently, there is some evidence in this record that at least some suggestion that he might have been going to a party. But at any rate, people come onto any property, KCDC property, any other property, for a reason and it's because they know people, they want to visit with people, there are activities going on there that they want to participate in. And there's no reason to suggest that those events or those activities would cease to exist. And it was clear that the [d]efendant recognized no impediment to him coming on the property if he had what he considered a good reason to come on the property. So there was [sic] very good objective indications that the [d]efendant would continue to violate the law in this regard. So the [c]ourt finds that the arrest was valid.

With respect to the seizure of the vehicle, the trial court applied a totality of the circumstances test and concluded that the seizure was reasonable. The court found that the police knew that the defendant had a history of dealing drugs in the Austin Homes area; that he "was deliberately violating the criminal trespass law"; that the car the defendant was driving was a rental car and "rental cars are often used in drug trafficking"; that the defendant was a parolee with limited privacy rights; that the defendant and Johnson "left the car and rapidly moved away from the car in opposite directions"; and that the defendant disassociated himself from the car following his arrest. Thus, the court concluded, the police were justified in seizing the vehicle for the purpose of conducting further investigation.

-10-

After his motion to suppress was denied, the defendant pled guilty to possession with intent to sell less than 0.5 grams of cocaine in a drug free school zone, possession of a firearm during the commission of a dangerous felony, simple possession of a controlled substance, and criminal trespass. *See* T.C.A. §§ 39-14-405, -17-417, -17-418, -17-1324, -17-432. As a condition of his plea, the Defendant sought to reserve two certified questions of law challenging his arrest and the subsequent seizure of the Impala.

The record reflects that the defendant properly preserved the following certified questions of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2) challenging the trial court's suppression ruling:

1. Whether the arresting officer's reliance on [Tennessee Code Annotated section] 40-7-118(c)(2) when arresting the [d]efendant for the offense of criminal trespass was "objectively reasonable" under the Fourth and Fourteenth Amendments to the United States Constitution and article I, [section] 7 of the Constitution of the State of Tennessee.

2. Whether the seizure of the automobile, in which the trial court found the [d]efendant had a reasonable expectation of privacy, was based upon reasonable suspicion that the automobile was or contained evidence or fruits of criminal activity at the time it was seized and whether there was reasonable cause to believe that impoundment was reasonably necessary under the circumstances.

The trial court's findings of fact in a suppression hearing will be upheld on appeal unless the evidence preponderates against those findings. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008). The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. *Id.* However, the application of the law to the trial court's findings of fact is a question of law subject to de novo review. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The defendant contends that his custodial arrest for a misdemeanor was illegal because he should have been issued a citation and released pursuant to Tennessee Code Annotated section 40-7-118(b)(1). The defendant contends that both the arresting

-11-

officer and the trial court misapplied the exception in Tennessee Code Annotated section 40-7-118(c)(2) because they contemplated whether the offense was likely to continue or resume at some point in the future, rather than immediately after a citation was issued. The State responds that the arresting officer's reliance on subsection (c)(2) when deciding to effect a custodial arrest was proper.

Tennessee Code Annotated section 40-7-118 provides that an officer "who has arrested a person for the commission of a misdemeanor committed in the . . . officer's presence, . . . shall issue a citation to the arrested person to appear in court in lieu of the continued custody and the taking of the arrested person before a magistrate." T.C.A. § 40-7-118(b)(1). Tennessee's "cite and release" statute has been interpreted as creating "a presumptive right to be cited and released for the commission of a misdemeanor." *State v. Walker*, 12 S.W.3d 460, 464 (Tenn. 2000) (holding that an Ohio cite and release statute "virtually identical to our own" created "a substantive right of freedom from arrest for one accused of the commission of a minor misdemeanor unless one of the statutory exemptions exists" (citing *State v. Slatter*, 423 N.E.2d 100, 104 (Ohio 1981))).

Certain exceptions to this general rule exist however. The pertinent exception in the present case authorizes an officer to effect the custodial arrest of a misdemeanant when "[t]here is a reasonable likelihood that the offense would continue or resume, or that persons or property would be endangered by the arrested person." T.C.A. § 40-7-118(c)(2). A custodial arrest in violation of the cite and release statute constitutes a violation of the right against an unreasonable search and seizure. *Walker*, 12 S.W.3d at 467. "[E]vidence seized as a result of the unlawful search is suppressed and not admissible in the prosecution's case in chief." *Id.*

The officers originally detained the defendant for criminal trespass, which is a Class C misdemeanor. *See* T.C.A. § 39-14-405(g). Therefore, he had a presumptive right to be cited and released from custody unless one of the exceptions in section 40-7-118(c) applies.

The language of the exception embodied in section 40-7-118(c)(2), which Officer Whitfield relied upon when arresting the defendant, requires that an officer's decision to effect a custodial arrest be based on the "reasonable likelihood" that the offense will continue or resume.

Although the trial court referred to the likelihood that the defendant would return to Austin Homes after the issuance of a citation, it also made "the facile observation that if [the defendant] was served with a citation right there he would still be

-12-

on KCDC property and still be in violation." We agree. In this case, the officers encountered the defendant when and where the trespass was being committed. Simply handing the defendant a citation would not change the ongoing trespass at that time and place. *See State v. Jackson,* 313 S.W.3d 270 (Tenn. Crim. App. 2008). Consequently, we hold that a reasonable likelihood, indeed a certainty, existed "that the offense would continue or resume." As such, the exception to the cite and release statute applies, with the result that the officer was authorized to arrest the defendant for the misdemeanor committed in his presence.

Having established that the officers validly arrested the defendant for trespass, we turn to the question whether the warrantless discovery of the pistol and other evidence in the vehicle, occasioned by the custodial detention, was valid.

During the defendant's detention as a result of being arrested, the officers saw the pistol in plain view in the vehicle the defendant had driven to the location. Although the rubric of "plain view" is often characterized as an exception to the warrant requirement, it really denotes a *non*-search; the doctrine refers to the discovery in "plain view" of an object in which the possessor has no reasonable expectation of privacy precisely because it lies in such plain view. In *Armour v. Totty*, our supreme court, in delineating the plain view doctrine, noted that the Fourth Amendment protects only "that which an individual seeks to 'preserve as private.'" *Armour v. Totty*, 486 S.W.2d 537, 539 (Tenn. 1972) (quoting *Katz v. United States*, 389 U.S. 347 (1967)). The court said, "An individual does not seek to 'preserve as private' that which falls in the 'plain view' of an officer who has the right to be there. Visual detection of this nature does not constitute a search within the meaning of the Fourth Amendment." *Id.* This court has previously held "admissible under the 'plain view' doctrine" a pistol lying in an automobile that was observed by an officer "inadvertently while at a place where he had a right to be." *State v. Yarbro,* 618 S.W.2d 521, 524 (Tenn. Crim. App. 1981). Indeed, "'[e]xtensive, and often noncriminal contact with automobiles will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband.'" *State v. Moats*, 403 S.W.3d 170, 182 (Tenn. 2013) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 442, (1973)). Accordingly, the *discovery* of the pistol did not offend constitutional limitations on searches and seizures.

Neither did the resulting *seizure and search* of the vehicle. The plain-view sighting of the pistol provided the officers probable cause to seize and search the vehicle. "The 'automobile exception' to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband." *State v. Saine,* 297 S.W.3d 199, 207 (Tenn. 2009) (quoting *Carroll v. United States*, 267 U.S. 132, 149, (1925)). The automobile exception to the warrant requirement is founded upon the impracticality in obtaining a warrant to search an inherently mobile situs and upon the "reduced expectation of privacy" in automobiles.

-13-

*Saine*, 297 S.W.3d at 207. Consequently, "[i]f the officer has probable cause to believe that the automobile contains contraband, the officer may either seize the automobile and then obtain a warrant or search the automobile immediately." *Id.* (citing *Chambers v. Maroney*, 399 U.S. 42, 52 (1970). Neither the United States Constitution nor the Tennessee Constitution requires "a separate finding of exigency in addition to a finding of probable cause." *Id.*

Thus, the officers' plain-view sighting of the pistol provided them with probable cause to either seize the vehicle and obtain a warrant to search it or to search the vehicle without a warrant. The officers obtained a warrant based upon validly acquired probable cause, and thus, the fruits of that search were admissible into evidence.

In light of the above responses to the defendant's certified questions, we affirm the judgments of the trial court.

_____
J. CURWOOD WITT, JR., JUDGE