# IN THE SUPREME COURT OF TENNESSEE
September 30, 2020 Session[1]

## STATE OF TENNESSEE v. SAMANTHA GRISSOM SCOTT

**Appeal by Permission from the Court of Criminal Appeals
Circuit Court for Warren County
No. 18-CR-1805   Larry B. Stanley, Jr., Judge**

_____

### No. M2018-01852-SC-R11-CD

_____

Defendant, Samantha Grissom Scott, pleaded guilty to possession with the intent to deliver more than twenty-six grams of methamphetamine and possession of drug paraphernalia but specifically reserved a certified question of law pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure. The trial court, Defendant, and the State all agreed that the certified question is dispositive of the case. The question pertained to the legality of the initial search of Defendant's house during which law enforcement discovered illegal contraband. In a split opinion, the Court of Criminal Appeals dismissed the appeal after determining that the certified question is not dispositive because the evidence would have been admissible under the inevitable discovery doctrine notwithstanding the search in question. We conclude that the certified question is dispositive of the case, that the inevitable discovery doctrine does not apply, that exigent circumstances did not exist, that Defendant's consent to the search was involuntary, and that the case against her should be dismissed. We, therefore, reverse the judgment of the Court of Criminal Appeals and dismiss Defendant's convictions.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Circuit Court Convictions Dismissed

ROGER A. PAGE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and HOLLY KIRBY, JJ., joined.

Benjamin K. Raybin, Nashville, Tennessee (on appeal); and Brent O. Horst, Nashville, Tennessee (at trial and on appeal), for the appellant, Samantha Grissom Scott.

_____

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; David H. Findley, Senior Assistant Attorney General; T. Austin Watkins, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Matthew T. Colvard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTS AND PROCEDURAL HISTORY

This appeal arises from a certified question of law regarding the legality of a search during which law enforcement found illegal drugs in the home of Samantha Grissom Scott ("Defendant"). After the trial court denied her motion to suppress the evidence found during the search, Defendant pleaded guilty to drug-related charges subject to the outcome of the appeal of this certified question. The record on appeal consists mostly of testimony provided at Defendant's suppression hearing.

The matter began when the White County Sheriff's Office asked the neighboring Warren County Sheriff's Office to look for a male named Ronald Dishman who had multiple outstanding warrants for his arrest from White County. An employee of White County told an employee of Warren County that Mr. Dishman was likely armed with a handgun or a rifle and gave an address of a home where Mr. Dishman was supposedly located. About twenty minutes later, with this limited information and without any independent corroboration, nine Warren County deputies converged on the given address, which was Defendant's home.

Upon arrival, Deputy Derek Bowles, who did not testify at the suppression hearing, saw a white male standing on the porch of the house. After seeing Deputy Bowles, the man went inside the house and shut the door behind him. For reasons that are not entirely clear, Deputy Bowles assumed that the man he saw on the porch was the intended arrestee, Mr. Dishman. The events that followed apparently flowed from Deputy Bowles' initial determination that the man on the porch "matched the description" that he had been given of Mr. Dishman. The record reflects Deputy Bowles was told that Mr. Dishman was a man and possibly located at Defendant's address.

After the man on the porch went inside, the deputies surrounded the house armed with weapons (including shotguns and rifles). Deputy Tyler Glenn testified that he had a clear view of the front door of the house and could see several silhouettes running through the house. The deputies began yelling over loudspeakers toward the house, "Subjects in the residence, please come out with your hands up; we have the house surrounded." This

- 2 -

stand-off went on for approximately twenty to thirty minutes until Defendant eventually exited her home. Once she came out of her house, Defendant was told to put her hands above her head, get down on her knees, and "walk" backwards from her front porch to the edge of the woods by her house.

Defendant explained to the deputies that the man they were searching for, Ronald Dishman, was not inside the home. She offered to phone Mr. Dishman for them, but the deputies refused and continued to command the male subject to come out of the house. After five or ten more minutes, the male who had been seen on the porch emerged from the home. He was not Mr. Dishman, but rather a friend of Defendant named Scott Bell.

Apparently believing that there was still someone inside the home, the deputies pressed Defendant repeatedly for consent to enter her home and look for Mr. Dishman. Defendant refused, and she and Mr. Bell insisted that Mr. Dishman was not in the house. After approximately one hour had passed from the time law enforcement surrounded her home, Defendant finally relented and gave written consent allowing law enforcement to search her home for Mr. Dishman. The deputies then entered with weapons drawn to "clear" the house and returned outside after determining that neither Mr. Dishman nor anyone else was inside.

After Investigator Aaron Roberts left the house, he said that he had seen a bag of methamphetamine on the floor of a bedroom. Another deputy testified that the inside of the house had a "strong chemical smell" and that the air was "foggy." When confronted with this information, Defendant refused to consent to any further search of the house. The deputies then took several hours and obtained a search warrant for the home based on the information they saw during the sweep. While executing the search warrant, the deputies found methamphetamine, drug paraphernalia, and cash. As a result, Defendant was charged with one count of possession of a schedule II controlled substance, methamphetamine greater than twenty-six grams, with intent to deliver; one count of tampering with evidence; and one count of possession of drug paraphernalia.[2]

Defendant filed a "Motion to Suppress Evidence Seized from Unlawful Search" and asked the trial court to exclude any of the evidence obtained by the deputies during their initial sweep of her home and the subsequent search with a warrant. Defendant alleged that the searches of her home were unlawful and in violation of the Fourth Amendment to the Constitution of the United States of America and Article 1, Section 7 of the Constitution

---

[2] As part of her guilty plea agreement, the tampering with evidence charge against Defendant was dismissed.

- 3 -

of the State of Tennessee. Specifically, Defendant argued that her initial "consent" to search her home for Mr. Dishman was the result of an "illegal entry, illegal search, and illegal coercion" due to:

1. The overwhelming show of force;
2. The officers' entering and remaining on the curtilage of her home without permission or warrant;
3. The officers' failure to leave after a reasonable amount of time; and
4. The officers' pointing weapons at the Defendant without any display or threat of violence from the Defendant who has no violent history.

Defendant argued that because the "consent" was obtained by the deputies through illegal coercive conduct, the consent was invalid, and any observations made by the deputies "while in the home based on that initial consent must be stricken from the affidavit used to obtain the search warrant." Without the observations by the deputies while they were inside the home illegally, there was no probable cause for the subsequent search warrant, and the "subsequent search must fall and all evidence obtained from the search must be suppressed as fruit of the poisonous tree."

During the hearing on her Motion to Suppress, Defendant testified that on the day in question she was at her house when her friend, Mr. Bell, walked inside and told her he saw several cars pull up in the yard. Defendant looked outside and said she saw guns and people everywhere. There was a group of deputies crouched down behind car doors with guns pointed at her house. Mr. Bell told Defendant he heard them yelling for someone named "Ronnie." Defendant realized they were looking for her step-brother, Ronald Dishman, who was not there and had never lived there. Defendant testified that it took her several minutes to emerge from the house because she was having a panic attack after seeing all of the guns. She eventually gathered herself and came outside because she felt she had no other choice and felt "threatened" and "frightened."

Defendant testified that once she came outside, she crawled in the rain through the mud towards the officers with their guns drawn and pointed at her. When the officers asked her for permission to enter the house to look for Mr. Dishman, she said, "no." Defendant testified, however, that the officers kept asking "over and over continuously." She stated, "I felt like I didn't have a choice. They were going to go in my home whether I signed it or not." She testified that she eventually consented to the search for Mr. Dishman "after a lot of coercion." According to Defendant, she did not want to sign the consent form allowing the search of her home, but the deputies told her that she "might as well go ahead

- 4 -

and sign it because they're going in anyway." Defendant described her emotional state at the time as "terrified."

In addition to Defendant, Defendant's daughter and mother both testified at the suppression hearing. They arrived at Defendant's home at different times. Defendant's daughter, Brittany Pack, testified that when she arrived at the home, law enforcement "started pointing guns and hollering and telling me to get out of the car and asking me who I was." Ms. Pack stated that she saw her mother on the ground in the wooded area with deputies surrounding her and guns pointed at her. She described her mother as being "very scared" and "crying hysterically." According to Ms. Pack, no one ever hurt her mother while trying to convince her to consent to the search, but the deputies "kept on and on pressuring her and pretty much telling her that they were going in regardless." Defendant's mother testified that when she was at the scene she witnessed her daughter upset and crying with a deputy on each side of her.

The two employees of the Warren County Sheriff's Office who testified at the suppression hearing, Deputy Tyler Glenn and Investigator Steven Carpenter, both denied that Defendant's consent was involuntary. According to Deputy Glenn, the responding officers were armed because they were looking for a person whom they believed to be an armed subject. Investigator Carpenter described Defendant as being "nervous" but not "distressed" or under duress. He denied that the officers told Defendant that they would enter the home regardless of whether she gave consent.

After hearing the evidence, the trial court denied Defendant's motion to suppress. The trial court's oral ruling indicated that the judge believed that the deputies had exigent circumstances to justify their actions after seeing Mr. Bell, whom they believed to be Mr. Dishman, quickly go back in the home after he saw law enforcement. In light thereof, the trial court held that if the deputies were legitimately able to stay and surround the home, then Defendant's subsequent consent to search the home was not coerced. However, the court noted that "[i]f the Court of Criminal Appeals finds otherwise . . . that one incident with regard to the gentleman that they saw on the porch and his activity did not give exigent circumstances, then certainly at that point forward, any consent would not be valid."

After the trial court denied her motion to suppress, Defendant pleaded guilty to the drug-related charges. With the express consent of the State and the trial court, she explicitly reserved the following certified question of law pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure:

Was the consent provided by the Defendant to conduct a warrantless search of her home invalidated by the warrantless seizure and constructive search of her home and curtilage in violation of the Fourth Amendment to the Constitution of the United States of America and Article 1 § 7 of the Constitution of the State of Tennessee, or did the officers have exigent circumstances to constructively seize and remain on the property while they obtained consent because there were facts which led them to believe that an exigent circumstance existed — which was that they possessed an arrest warrant for a person they believed to be inside the residence.

In the Court of Criminal Appeals, the State argued for the first time that the certified question is not actually dispositive of the case and that the appeal must therefore be dismissed. According to the State, the evidence in question would have been admissible under the "inevitable discovery doctrine" regardless of the answer to the certified question. Accordingly, the State argued, the certified question is not dispositive and the appellate court lacked authority under Rule 37(b)(2)(A) to rule on the merits of the appeal. A majority of the Court of Criminal Appeals agreed with this assertion and, without addressing the certified question, dismissed the appeal. *State v. Scott*, No. M2018-01852-CCA-R3-CD, 2020 WL 262992 (Tenn. Crim. App. Jan. 16, 2020), *perm. app. granted* (Tenn. June 4, 2020). According to the intermediate court, the deputies in this case "could have" obtained a warrant to search the home for Mr. Dishman, and therefore the evidence would have been inevitably discovered. *Id.* at *5. Judge Camille McMullen, however, dissented and opined that the majority "misapprehended" the inevitable discovery doctrine. *Id.* at *6–7 (McMullen, J., dissenting). She found no basis for the inevitable discovery argument and stated that she would have reversed the Defendant's convictions. *Id.* We granted permission to appeal.

## II.     ANALYSIS

### A.     Standard of Review

The State in this case argues, and the Court of Criminal Appeals agreed, that the certified question pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(A) is not dispositive of this case and the appeal should therefore be dismissed. Whether the certified question is dispositive of the case is a question of law and we review the issue de novo. *State v. Dailey*, 235 S.W.3d 131, 134–35 (Tenn. 2013) ("The appellate court, however, 'is not bound by the determination and agreement of the trial court, a defendant, and the State that a certified question of law is dispositive of the case.'" (quoting *State v. Thompson*, 131 S.W.3d 923, 925 (Tenn. Ct. Crim. App. 2003))).

- 6 -

Regarding the merits of the certified question, we review a trial court's findings of fact in ruling on a motion to suppress with a presumption of correctness unless the evidence preponderates against them. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Id.*

### B.      Whether the Certified Question is Dispositive

Pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, a defendant may plead guilty and appeal a certified question of law that is dispositive of the case so long as certain conditions are met. This Court has explained the process as follows:

> After entering a guilty plea under Tenn. R. Crim. P. 11(a)(3), a defendant must explicitly reserve, with the consent of the state and the trial court, the right to appeal a dispositive question of law. In addition to reserving the question of law, the defendant must draft the question so that its scope and limits are clearly stated for the reviewing court. Appellate courts lack jurisdiction to hear any issue beyond the scope of the certified question.

*State v. Springer*, 406 S.W.3d 526, 530–31 (Tenn. 2013) (footnote omitted) (citations omitted).

As set forth above, the State argued for the first time in the Court of Criminal Appeals that Defendant's certified question of law is actually not dispositive because the drugs in her home would have been inevitably discovered, and therefore not suppressed, regardless of whether her consent to search the home was legally obtained.[3]

The Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. *State v.*

---

[3] Defendant asks this Court to hold that the State waived this argument and should be equitably estopped from asserting that the certified question is not dispositive when it agreed at the trial court level that it is dispositive. Whether a certified question is dispositive is an issue of jurisdiction. *See Springer*, 406 S.W.3d at 531. Courts maintain authority to consider jurisdictional issues *sua sponte. Hooker v. Haslam*, 437 S.W.3d 409, 433 (Tenn. 2014). "[T]he reviewing court must make an independent determination that a certified question is dispositive." *Dailey*, 235 S.W.3d at 135. We do not opine as to whether there may be some set of circumstances under which the State should be estopped from changing course on appeal and asserting that a certified question is not dispositive when it previously agreed to the contrary. However, because we conclude that the certified question in this case is in fact dispositive, the issue of waiver is not determinative.

*Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000). As a remedial measure, the "exclusionary rule" generally provides that any evidence that was obtained unlawfully should be suppressed and excluded for the purposes of a criminal prosecution. *See Hudson v. Michigan,* 547 U.S. 586, 590 (2006). The United States Supreme Court has explained that the purpose of the exclusionary rule is "to deter police from violations of constitutional and statutory protections" and ensure that "the prosecution is not to be put in a better position than it would have been if no illegality had transpired." *Nix v. Williams*, 467 U.S. 431, 442–43 (1984). In the case at hand, Defendant alleges that the drugs found in her home should have been suppressed because they were the result of an illegal search of her home.

The "inevitable discovery doctrine," which is asserted by the State, is an exception to the exclusionary rule that applies when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct." *Nix*, 467 U.S. 431 at 448. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444. The inevitable discovery doctrine "rests upon the principle that the remedial purposes of the exclusionary rule are not served by suppressing evidence discovered through a later, *lawful* seizure that is *genuinely independent* of an earlier, tainted one." *State v. Williamson*, 368 S.W.3d 468, 483 (Tenn. 2012) (quoting *Hudson*, 547 U.S. at 617) (Breyer, J., dissenting).

The State maintains that "[t]he record reflects that, even without the defendant's consent to the search of her home, law enforcement officers *would have* obtained a search warrant for her home and discovered the contraband anyway." (Emphasis added). The Court of Criminal Appeals held that "[t]he deputies *could have* obtained and executed a search warrant without Defendant's consent in order to search the home for Mr. Dishman, and the drug-related evidence would have been inevitably discovered." *Scott*, 2020 WL 262992, at *5 (emphasis added). We agree with Judge McMullen that the majority of the intermediate court appears to "misapprehend" the inevitable discovery doctrine. *See Scott*, 2020 WL 262992, at *6 (McMullen, J., dissenting). The ultimate test is whether the evidence would have been discovered through an independent, proper avenue that comports with the Fourth Amendment. Whether law enforcement could have obtained a search warrant is not the same inquiry as whether law enforcement ultimately would have obtained that search warrant or whether law enforcement inevitably would have discovered the evidence through lawful means. We must not conflate these important distinctions.

Tennessee courts have long interpreted the inevitable discovery doctrine as requiring more than a mere showing that evidence *could have* been obtained through independent

and lawful means; rather, the proof of inevitable discovery must show, with a level of certainty, that the evidence *would have* been obtained based on "no[n-]speculative elements . . . focuse[d] on demonstrated historical facts capable of ready verification or impeachment." *State v. Hill*, 333 S.W.3d 106, 123 (Tenn. Crim. App 2010) (quoting *Nix*, 467 U.S. at 444 n.5)); *see also State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (reasoning that proof of the later consensual search of the defendant's residence was sufficient to show that evidence "would have been inevitably discovered"); *State v. Carpenter*, 773 S.W.2d 1, 6–7 (Tenn. Crim. App. 1989) (determining that the doctrine did not apply because a witness's statements regarding the unknown location of evidence in a landfill created uncertainty that the evidence would have been inevitably discovered). This fact-specific inquiry requires this Court to examine if the record provides sufficient proof that the evidence *would have*, not just *could have*, been inevitably discovered through independent lawful means.

We note that the United States Court of Appeals for the Sixth Circuit has come to the same conclusion in rejecting the "could have" theory, which is articulated by the intermediate appellate court in this case. We agree with the line of Sixth Circuit cases that reject the argument that the inevitable discovery doctrine applies in cases when law enforcement had probable cause to obtain a search warrant but simply failed to do so. *See United States v. Quinney*, 583 F.3d 891, 894–95 (6th Cir. 2009) (rejecting the government's reliance on the inevitable discovery doctrine when agents had probable cause to obtain a search warrant but instead seized the evidence without a warrant); *United States v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001) (holding that a warrantless search of the defendant's home was not subject to the inevitable discovery doctrine when the police could have obtained a warrant but did not do so). Allowing the State to rely on the inevitable discovery doctrine in circumstances such as these is "untenable" because it would "completely obviate the warrant requirement." *See Quinney*, 583 F.3d at 894 (quoting *Haddix*, 239 F.3d at 768). These cases are consistent with Tennessee jurisprudence in holding that the question is whether the evidence *would have* inevitably been discovered through independent lawful means. In all of these cases, law enforcement could have obtained a search warrant. That is not enough to show that the evidence would have been inevitably discovered.

Moreover, the Sixth Circuit cases cited above, *Quinney* and *Haddix*, involved situations in which law enforcement had probable cause necessary to procure a search warrant and failed to do so. Despite the State's assertions to the contrary, there is nothing in the record to establish that the State either could have or would have obtained a search warrant for Defendant's home. The record is devoid of probable cause for the deputies to obtain a search warrant for Defendant's home without relying on the information they

gathered during the initial search. The inevitable discovery doctrine requires the State to show that they would have discovered the evidence through a later, *lawful* seizure that is *genuinely independent* of an earlier, tainted one. The record lacks any evidence indicating why the White County Sheriff's Department believed Mr. Dishman would be at Defendant's home on that date, and Deputy Glenn admitted he had no independent information about Mr. Dishman concerning his whereabouts or his physical appearance. The only information law enforcement had at the time they surrounded Defendant's home was that Mr. Dishman was a male, he was potentially armed, and he had multiple arrest warrants from White County. Based on these facts, there was no probable cause by which the deputies could have secured a search warrant for Mr. Dishman even if they had tried— which they did not. Therefore, the record is insufficient to show that the evidence would have been inevitably discovered.

As a result of the foregoing, we conclude that the Court of Criminal Appeals erred in holding that the inevitable discovery doctrine applied to this case and thus the certified question is not dispositive.

## C.    Merits of the Certified Question

We, therefore, move on to the merits of the certified question of law, which bears repeating:

> Was the consent provided by the Defendant to conduct a warrantless search of her home invalidated by the warrantless seizure and constructive search of her home and curtilage in violation of the Fourth Amendment to the Constitution of the United States of America and Article 1 § 7 of the Constitution of the State of Tennessee, or did the officers have exigent circumstances to constructively seize and remain on the property while they obtained consent because there were facts which led them to believe that an exigent circumstance existed — which was that they possessed an arrest warrant for a person they believed to be inside the residence.

A search without a warrant is presumed to be unreasonable unless one of the exceptions to the warrant requirement applies. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). Moreover, without exigent circumstances, the Fourth Amendment generally requires that police obtain a search warrant to execute an arrest warrant in the home of a third person. *See Steagald v. United States*, 451 U.S. 204, 213–22 (1981). There is no dispute that the State conducted a warrantless search of Defendant's home. The State argues, however, that two exceptions to the warrant requirement apply in this case that

- 10 -

excuse this failure—(1) exigent circumstances existed to justify the constructive seizure of Defendant's home, and (2) Defendant's consent.

Determining whether Defendant voluntarily consented to the warrantless search of her home requires an explanation of the circumstances leading up to her consent. Once law enforcement observed Mr. Bell go inside Defendant's home, they surrounded the home, ordered Defendant and Mr. Bell outside, and for half an hour repeatedly pressed Defendant for consent to enter the home to search for Mr. Dishman. The State argues that "exigent circumstances" justified the seizure of the home and that law enforcement properly obtained consent.

In certain situations, "exigent circumstances" may justify the seizure of a home to execute an arrest warrant for someone who does not live there. *Patterson*, 966 S.W.2d 435, 441 (Tenn. 1997). This applies when "the 'urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant.'" *State v. Reynolds,* 504 S.W.3d 283, 304 (Tenn. 2016) (quoting *Meeks*, 262 S.W.3d at 723). When reviewing this as the basis for a warrantless search, a "court must determine 'whether the circumstances gave rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant.'" *Id.* (quoting *Meeks*, 262 S.W.3d at 723).

> [T]he following are frequently-arising situations that have been found to be sufficiently exigent to render a warrantless search of a domicile reasonable: (1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury.

*Meeks*, 262 S.W.3d at 723 (Tenn. 2008). Furthermore, these exigent circumstances "may not be created by the law enforcement officer's actions." *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005).

One possible "exigent circumstance" in this case would be if the officers were acting "in response to an immediate risk of serious harm to the police officers or others." *Meeks*, 262 S.W.3d at 723. The record does not support this theory. Mr. Bell did not threaten the officers with a weapon. He simply went inside and closed the door when he saw the deputies. Although law enforcement had been alerted that the intended arrestee may have a gun, we cannot determine under these circumstances that exigent circumstances existed that would justify the armed seizure of Defendant's home and person. As to the arguable

exigent circumstance of preventing the destruction of evidence, there is simply nothing in the record to support it.

The State also asks this Court to find an exception to the warrant requirement because Defendant ultimately gave consent for law enforcement to search her home for Mr. Dishman. Consent to conduct the search or seizure is another exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). However, for the consent to be valid, the State has the burden of proving that it was "freely and voluntarily given." *Id.* (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 225–26). When determining whether consent was given voluntarily, the court may consider factors such as:

1. Time and place of the encounter;
2. Whether the encounter was in a public or secluded place;
3. The number of officers present;
4. The degree of hostility;
5. Whether weapons were displayed;
6. Whether consent was requested; and
7. Whether the consenter initiated contact with the police.

*State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005).

After consideration of these factors and the record as a whole, we determine that Defendant's consent was not voluntarily given and was therefore invalid. At least nine armed law enforcement officers converged on Defendant's home with guns drawn. For thirty minutes Defendant refused orders to come outside because she was having a panic attack due to the armed deputies in her yard. After she finally exited her residence, Defendant was detained by deputies who continued to ask her for another thirty minutes for consent to search her home for Mr. Dishman. This continued even after Mr. Bell—who was apparently thought to have been Mr. Dishman—exited the home and was clearly not Mr. Dishman. The testimony at the suppression hearing described Defendant as being extremely upset, crying, and ultimately relenting to the officers' requests only after being detained for nearly an hour. Under these circumstances, Defendant's consent to search the home was not freely and voluntarily given. This determination is consistent with the trial court's finding that in the absence of exigent circumstances Defendant's consent "would

not be valid." Accordingly, because we determine that there were no exigent circumstances to justify detaining Defendant, and because we determine that Defendant's consent was not freely and voluntarily given, we hold that the initial search of Defendant's home was unlawful. As a result, the subsequent search of Defendant's home pursuant to the search warrant obtained by the deputies using evidence viewed during the initial unlawful search was tainted, and the evidence collected during that search is inadmissible. The motion to suppress should have been granted.

### III.    CONCLUSION

We conclude that the inevitable discovery doctrine does not apply in this case and that the certified question of law is dispositive. We therefore reverse the Court of Criminal Appeals' dismissal of the appeal. We further conclude that the State did not carry its burden of proving that either exigent circumstances or voluntary consent justified their warrantless search of Defendant's home that led to the discovery of the evidence in question. We, therefore, reverse the holding of the Court of Criminal Appeals and dismiss Defendant's convictions.

_____
ROGER A. PAGE, JUSTICE