IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

## STATE OF TENNESSEE v. CALEB ISAAC REED

**Criminal Court for Carter County
Nos. 23487, 23495, 23499, and 26955**

_____

**No. E2025-00260-CCA-R9-CO**

_____

## ORDER

The Defendant has filed an application for interlocutory appeal, *see* Tenn. R. App. P. 9, seeking review of the trial court's September 23, 2024 order and November 6, 2024 amended order denying the Defendant's motion to dismiss his indictment and granting the State's motion to have the Defendant involuntarily judicially committed pursuant to the Tennessee Disability and Aging Act of 2024 ("the Act"). *See* Tenn. Code Ann. § 52-5-404 (specifically regarding involuntary commitment for intellectually disabled defendants). The Defendant argues that interlocutory review of the trial court's orders is required to prevent irreparable injury, to prevent needless and protracted litigation, and to develop a uniform body of law. Tenn. R. App. P. 9(a)(1), (2), and (3). The State has filed an answer in opposition to the Defendant's application, arguing that three of the issues certified by the trial court ask for advisory opinions and that the three remaining issues do not satisfy the criteria for interlocutory appeal. Following our review, we grant the Defendant's application for interlocutory appeal, in part, and deny the application, in part.

## FACTUAL BACKGROUND

In August 2016, the Defendant was convicted of aggravated burglary and aggravated assault in Carter County Criminal Court case numbers 23487, 23495, and 23499 ("2016 cases"). The trial court imposed an effective sentence of six years' incarceration suspended to probation to be served consecutively to a prior unexpired sentence in an unrelated case. The prior sentence expired on May 25, 2021. On April 6, 2023, the Defendant was arrested for aggravated assault, aggravated burglary, and possession of drug paraphernalia. On April 20, 2023, three probation violation warrants issued in the 2016 cases based upon the new arrest. On July 17, 2023, a Carter County grand jury indicted the Defendant in case number 26955 with aggravated burglary, three counts of aggravated assault, and possession of drug paraphernalia ("2023 case") related

to the April 6 arrest.

After the Defendant exhibited behavior calling into question his competency to stand trial, the trial court ordered an outpatient competency evaluation to be performed by a regional mental health provider, Frontier Health.   *See* Tenn. Code Ann. § 33-7-301(a)(1). On February 23, 2024, Jorge Fuchs, a licensed senior psychological examiner with Frontier Health, reported that the Defendant was intellectually disabled and incompetent to stand trial.   Mr. Fuchs further opined that the Defendant could possibly benefit from competency training.   Therefore, on February 28, 2024, the trial court ordered the Defendant to undergo competency training with the Tennessee Department of Intellectual and Developmental Disabilities ("TDIDD").   On July 1, 2024, Shannon Westerman, a licensed senior psychological examiner with the Tennessee Department of Disability and Aging ("TDDA"—formerly TDIDD), reported that the Defendant remained incompetent to stand trial and "is unlikely to benefit from further training."   Based upon Ms. Westerman's recommendation and further evaluation, Dr. Lori Klinger of Frontier Health and Dr. Uduakobong Ipke of TDDA each filed a certificate of need stating that the Defendant met the requirements for involuntary judicial commitment.   Tenn. Code Ann. § 54-4-405.

On July 24, 2024, the Defendant filed a motion requesting that "he be declared incompetent to stand trial or face probation revocation proceedings."   The Defendant also sought dismissal of the charges in the 2023 case and of the probation violation warrants in the 2016 cases, arguing that the Defendant is unlikely to regain competency and that indefinitely committing the Defendant to the custody of the TDDA violates his equal protection and due process rights.   The Defendant asserted that the new charges and the probation violation warrants should be dismissed and that the State should instead institute civil commitment proceedings for the intellectually disabled Defendant.   *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).[1]   Relatedly, the Defendant noted that Code section 52-

---

[1]   In *Jackson*, the Supreme court held that a defendant's equal protection rights were violated by a judicial commitment statutory scheme that imposed upon an individual charged with a criminal offense "a more lenient commitment standard and a more stringent standard of release than those generally applicable to all others not charged with offenses."   *Jackson*, 406 U.S. at 730.   As to Jackson's due process claim, the Court further held that

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.   If it so determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

*Id*. at 735.

5-404(b) ("Jillian's Law") created a "rebuttable presumption" that an individual meets the standards for involuntary judicial commitment "if the person was charged with a felony or Class A misdemeanor and found by court to be incompetent to stand trial for the offense due to an intellectual disability" that can only be overcome "by clear and convincing evidence that the person does not pose a substantial likelihood of harm." Tenn. Code Ann. § 52-5-404(b)(1) and (2). The Defendant argued that the rebuttable presumption subjects an intellectually disabled individual who is incompetent to stand trial "to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with criminal offenses." *See Jackson*, 406 U.S. at 730.

On August 28, 2024, the State filed a response in opposition to the Defendant's motion arguing that the rebuttable presumption in Jillian's Law does not violate due process or equal protection principles. Specifically, the State argued that "the broader statutory scheme" of the judicial commitment proceedings requires "clear and convincing evidence of the need for commitment, including two certificates of need from medical professionals reflecting that [the Defendant] poses a substantial likelihood of serious harm on account of his intellectual disability." Ergo, the State argued, the judicial commitment procedure for a criminal defendant imposes a more stringent standard for commitment and does not violate equal protection. The State also moved the trial court to judicially commit the Defendant to the custody of the TDDA for involuntary care and treatment.

At the September 5, 2024 judicial commitment hearing, Jorge Fuchs testified that as the forensic coordinator and a clinical psychologist with Frontier Health, he is "involved in 99.9% of the forensic evaluations" in their office. He stated that he reviewed the Defendant's history of evaluations and determined that the Defendant met the criteria for an intellectual disability as his intellectual deficits manifested before the age of eighteen and his full-scale IQ at age 17 was at the mild to moderate range with a score of 52. Mr. Fuchs noted that, despite the intellectual disability determination, the Defendant was deemed to be competent to stand trial when previously evaluated at the age of nineteen. However, Mr. Fuchs' evaluation of the now thirty-five-year-old Defendant on February 16, 2024, revealed that the Defendant has experienced "a deterioration in his ability to really understand the [judicial] process" and was no longer competent. Mr. Fuchs opined that this deterioration could have resulted, in part, from the Defendant's suffering from a seizure disorder, which has led to several falls causing possible head trauma. He based his conclusion on the Defendant's inability to understand the roles of courtroom participants, reports of his aberrant behavior in court, and the Defendant's difficulty in retaining information concerning the overall judicial process. Nevertheless, because the Defendant had previously been determined to be competent, Mr. Fuchs opined that "there was a potential that maybe with some education, some further education, that the Defendant might be able to obtain competency." He noted also that the Defendant suffers from schizoaffective disorder and had, in the past, experienced some psychotic episodes when

3

untreated. He also stated that there were no available local alternatives for mandatory outpatient treatment that would meet the Defendant's needs.

Shannon Westerman, a senior psychological examiner and forensic examiner with the TDDA, testified that the Defendant was referred to her for competency training by Mr. Fuchs. She reported that the Defendant was unable to complete "baseline competency testing" for an intellectually disabled defendant and was, therefore, never able to begin competency training. She stated that the Defendant showed no signs of malingering and exhibited some psychosis. She recalled that the Defendant would become agitated at the amount of time he had spent in jail and that his singular focus was to be released. Ms. Westerman testified that overall the Defendant could not retain information concerning and understand the judicial process, which is why she determined him to be incompetent. Ms. Westerman testified that it is impossible to tell whether the Defendant would regain competency. She further stated that the Harold Jordan Center ("HJC") is the only inpatient program available for an intellectually disabled individual with pending criminal charges to receive treatment and competency training. She also said that intermediate-level care facilities are typically unavailable to individuals with pending criminal charges.

Tennessee Department of Probation and Parole Officer Kelly Siderski testified that she supervised the Defendant while he was on enhanced supervision probation from June 2021 through April 2023. She recalled that the Defendant could neither read nor write and that department staff would assist the Defendant in completing forms. Ms. Siderski testified that the Defendant had difficulty keeping his appointments without additional support from a family member with whom Ms. Siderski coordinated. Ms. Siderski testified that the Defendant was unable to comply with the conditions of probation without additional assistance from family members. She recalled that in the time leading to the issuance of the probation violation warrants, she became increasingly concerned that the Defendant was not provided adequate assistance to ensure his safety or his compliance with his probationary release. She stated that the Defendant began to miss appointments due to a lack of transportation and often reported having fallen due to balance issues related to his seizure disorder.

Dr. Lori Klinger, a clinical psychologist with Frontier Health, testified that she filed a certificate of need concerning the Defendant in July 2024 after determining that the Defendant qualified for involuntary commitment based upon the Defendant's intellectual disability posing a substantial likelihood of serious harm to the Defendant. She testified that the risk of harm included the Defendant's inability to adhere to medical treatments and his history of seizures and psychosis. Dr. Klinger acknowledged that outpatient treatment may be available to patients with "supportive housing and transportation" arrangements but that the Defendant did not have such a support system. She also stated that any available less drastic alternatives to judicial commitment were not suitable to meet the

4

Defendant's needs.

Dr. Uduakobong Ipke, a psychology director with TDDA, testified that she conducted an assessment via videoconference of the Defendant to determine whether a basis existed for filing a certificate of need. She determined that the Defendant is both intellectually disabled and committable because his intellectual disability poses a substantial likelihood of serious harm to himself due to his inability to adhere to treatment for his seizure disorder. Dr. Ipke explained that she was not aware of any community-based alternatives available to the Defendant. Dr. Ipke filed a certificate of need stating that the Defendant suffers from an intellectual disability requiring care, training, and treatment; that the Defendant poses a substantial likelihood of serious physical harm because of his intellectual disability; and that any available less drastic measures for treatment are unsuitable. Dr. Ipke explained that the HJC was the only available inpatient treatment facility for intellectually disabled patients with pending criminal charges. Dr. Ipke further explained that HJC only had four available beds. Therefore, the Defendant may have to wait in the custody of the Carter County jail before being transferred to HJC.

David Mark Markland testified that he had known the Defendant for the Defendant's entire life. He recalled the events leading up to the Defendant's most recent arrest. He said that the Defendant appeared in his driveway and claimed to have had a seizure. Mr. Markland said that he bandaged the Defendant and then took him home. The next day, the Defendant entered Mr. Markland's home and refused to leave. He testified that the Defendant pulled a knife on him and insisted that "it was his house." Mr. Markland said that the Defendant's mind "comes and goes" and that he "needs help." He testified that he had attempted in the past to teach the Defendant to read a tape measure so that he could work but that the Defendant could not retain information. Mr. Markland also recalled that the Defendant stole items from Mr. Markland's mother's home after she died.

Amanda Baise testified that Mr. Markland, who is her cousin, called her for help removing the Defendant from his home. When she arrived with a friend, Misty Lusk, the Defendant was "[a]cting all crazy" and did not recognize her even though she had known him his entire life. Ms. Baise described the Defendant as "crazy as a loon." She said that he "scratched [her] pretty good" and lunged a knife toward Ms. Lusk. Ms. Lusk testified that the Defendant "was real aggressive" and refused to leave Mr. Markland's home. Both women testified that the incident ended only when police arrived, removed the Defendant from the home, and placed him under arrest.

At the conclusion of testimony, the Defendant argued that the testimony of the mental health professionals established that the Defendant was incompetent and that there exists a substantial probability that he never will regain competency. The Defendant, therefore, asserted that due process considerations require that the charges be dismissed

and that the State pursue civil commitment proceedings. The Defendant argued that the judicial commitment statute is unconstitutional because it permits an "untrainable and incompetent" individual to be committed indefinitely with criminal charges pending. Conversely, the Defendant argued, any other intellectually disabled individual would have less restrictive community-based alternatives available. The Defendant argued that the trial court "should disregard Jillian's Law because of its unconstitutionality" but also argued that the judicial commitment statute, *in toto*, was unconstitutional because it violated due process and equal protection by imposing different standards upon criminally charged individuals than those imposed upon non-charged individuals. The Defendant also asserted that the providers who submitted the certificates of need did not meet their burden of establishing by clear and convincing evidence that less drastic measures were unavailable to the Defendant.

The State argued that the Defendant is not "a run-of-the-mill intellectually disabled person" and that his "risk to society and to himself" is "interwoven with his intellectual disability." The State opined that, while Jillian's Law is "not perfect," involuntary judicial commitment is the only option available to the Defendant.

At the conclusion of the hearing, the trial court discussed the involuntary judicial commitment provisions of the Act. [2] The trial court found that the Defendant qualified

---

[2]    Tennessee Code Annotated § 52-5-404 outlines the procedure and criteria for the involuntary judicial commitment of an intellectually disabled defendant. It provides, in pertinent part, that:

(a)  A person may be judicially committed to involuntary care and treatment in the custody of the commissioner in proceedings conducted in conformity with chapter 3, part 5 of this title only if:

(1)  The person has an intellectual disability;

(2)  The person poses a substantial likelihood of serious harm under § 52-5-402 because of the intellectual disability;

(3)  The person needs care, training, or treatment because of the intellectual disability;

(4)  All available less drastic alternatives to judicial commitment are unsuitable to meet the needs of the person; and

(5)  The district attorney general files a complaint to require involuntary care and treatment under § 52-5-403.

(b)(1) There is a rebuttable presumption that a person meets the standards in subdivisions (a)(1)-(4) for judicial commitment if the person was charged with a felony or Class

for commitment pursuant to Code section 52-5-404(a) and made specific findings that the Defendant has an intellectual disability, that the Defendant poses a substantial likelihood of serious harm to the himself and others because of his intellectual disability, that the Defendant requires care and treatment, and that less drastic alternatives to judicial commitment are not available to the Defendant. As to the availability of less drastic alternatives, the trial court opined,

> There may be less drastic alternatives to judicial commitment available in the state of Tennessee. They may be available to a person who is an average citizen and not facing a criminal charge. Because those scrubs and those slippers prevent [the Defendant] from being admitted into a number of facilities.

The trial court further stated, "I don't have to look at Jillian's Law for the rebuttable presumption. I'm not certain whether that's constitutional or not." The trial court then found that

> the State has met their burden for judicial commitment of [the Defendant]. The court finds that while portions of the statute may not be constitutional, portions of the statute are, and that the State has satisfied those portions with the Certificates of Need and with the testimony that the Court has heard here today.

By written order entered on September 23, 2024, the trial court found the Defendant to be incompetent to stand trial. The trial court further found that it was unclear "whether [the Defendant] can be made competent with further treatment and training" and, therefore, denied the Defendant's motion to dismiss the charges and probation violation warrants. The trial court further found that the certificates of need satisfied the statutory requirements and that the Defendant met the standard for involuntary judicial commitment to the custody of the TDDA. The trial court also found "that while some portions of the statute may not be constitutional, portions of the statute are" and ruled that "the State has put on proof sufficient for the Court to find the existence of the statutory requirements outlined in [Code

---

> A misdemeanor and found by a court to be incompetent to stand trial for the offense due to an intellectual disability; and
>
> (2) The presumption established by subdivision (b)(1) may only be rebutted by clear and convincing evidence that the person does not pose a substantial likelihood of serious harm.

Tenn. Code Ann. § 52-5-404 (2024).

section] 52-5-404(a)" and "it is unnecessary for the Court to look to Jillian's Law for a rebuttable presumption." The trial court ordered the Defendant committed to the custody of the TDDA no later than thirty days from the entry of the order and concluded, stating that

> [h]aving found that the statutory process for judicial commitment is legal, the Court finds that the result of the process should be upheld, and that the Department should provide the very care and treatment that the Court has determined that [the Defendant] needs. The Court finds that the statute does not contemplate [the Defendant]'s indefinite incarceration in the Carter County Jail waiting for placement.

By request of counsel for the TDDA, the trial court entered an amended order on November 6, 2024, removing the requirement that the Defendant be transferred to the custody of the TDDA within thirty days and, instead, requiring "monthly status updates on the availability of a suitable accommodation" for the Defendant. The Defendant was transferred to the custody of the TDDA and admitted to HJC on December 18, 2024.

The Defendant filed a timely motion for interlocutory appeal from the September 23, 2024 order, as well as a timely amended motion for interlocutory appeal from the November 6, 2024 amended order. On January 7, 2025, the trial court held a hearing on the Defendant's motion for interlocutory appeal and granted the motion from the bench.[3]

Thereafter, on January 24, 2025, Dr. Ipke corresponded with the trial court concerning the Defendant's status at HJC. Following her in-person evaluation of the

---

[3] The Defendant presented three issues in his motion for interlocutory appeal:

(1) Did the Court err in failing to dismiss the criminal case against Mr. Reed and release him from incarceration absent evidence that there is a substantial probability that Mr. Reed will attain competency in the foreseeable future?

(2) Does the judicial commitment procedure outlined in T.C.A §§ 52-5-403 and 52-5-404 violate the 14th Amendment's guarantee of equal protection of the laws when such judicial commitment procedure only applies to a person with an intellectual disability who has been criminally charged and found incompetent to stand trial or not guilty by reason of insanity when there is no such commitment procedure generally applicable to all others with an intellectual disability in Tennessee?

(3) Did the Court err in judicially committing Mr. Reed absent clear and convincing evidence that all available less drastic alternatives to judicial commitment are unsuitable to meet the needs of Mr. Reed?

Defendant, Dr. Ipke concluded that

> [d]ue to intellectual deficits, [the Defendant] lacks sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and lacks rational as well as factual understanding of the proceedings against him. It is the opinion of this examiner that [the Defendant] does not appear to be competent to stand trial in keeping with Tennessee standards and is unlikely to benefit from training at this time.
>
> [The Defendant] would benefit [from] continued treatment at HJC. He would also benefit from increased service and intervention in the community as well as supported living with consistent staff support and supervision. Thus, referrals for service, placement in the community and other areas of support will be identified and addressed with the treatment team at HJC with a goal of transition to a less drastic alternative and improved functioning upon his return to the community.

On February 11, 2025, the trial court entered a written order granting the Defendant's motion for interlocutory appeal. In so doing, the trial court incorporated Dr. Ipke's January 24 correspondence with its consideration of the testimony and argument presented at the previous hearings. The trial court found that the Defendant continues to qualify for involuntary judicial commitment without application of the rebuttal presumption. The court also found that Dr. Ipke's January 24 correspondence suggests that less drastic alternatives to judicial commitment may eventually be identified and available but that currently there are no less drastic alternatives available to meet the Defendant's needs. That said, the trial court expressed concern that the Defendant's case "will languish for five, 10, 20 years or more while the [TDDA] has custody of [the Defendant] pursuant to the order of judicial commitment."

The trial court found that an interlocutory appeal should be granted to prevent irreparable injury "in this case and in future cases where intellectually disabled persons who are charged with criminal offenses may be judicially committed and deprived of their liberty indefinitely" either by being held in jail awaiting TDDA services or by being held at HJC when less drastic alternatives may not be available "in a timely manner." Tenn. R. App. P. 9(a)(1). The trial court also found that interlocutory appeal was warranted to prevent needless, expensive, and protracted litigation in the Defendant's case could remain pending "potentially indefinitely" when an intellectually disabled and incompetent defendant "is never able to be restored to competence." Tenn. R. App. P. 9(a)(2). Finally, the trial court found that an interlocutory appeal should be granted to develop a uniform body of law surrounding the constitutionality and application of the newly enacted involuntary judicial commitment statute. Tenn. R. App. P. 9(a)(3).

In granting interlocutory review, the trial court certified six issues for review:

(1) Should the trial court reverse its decision to deny Mr. Reed's motion to dismiss the criminal case against him when he was found incompetent to stand trial and, at the time, there was no proof of a substantial probability that he will attain competency in the foreseeable future?

(2) Even if the trial court did not initially err in denying Mr. Reed's motion to dismiss, should the criminal case against Mr. Reed now be dismissed based upon the January 24, 2025 letter from the Department of Disability and Aging, which indicates that Mr. Reed, who suffers from intellectual deficits, is incompetent to stand trial and is unlikely to benefit from further competency training at this time, meaning there is no proof of a substantial probability that he will attain competency in the foreseeable future?

(3) If the criminal case against Mr. Reed is dismissed, does this Court have the power to continue enforcing Mr. Reed's judicial commitment to the care and custody of the Department of Disability and Aging?

(4) Does the judicial commitment procedure outlined in Tennessee Code Annotated sections 52-5-403 and 52-5-404 violate the Fourteenth Amendment's guarantee of equal protection of the laws when such judicial commitment procedure only applies to a person with an intellectual disability who has been criminally charged and found incompetent to stand trial or not guilty by reason of insanity when there is no such commitment procedure generally applicable to all others with an intellectual disability in Tennessee?

(5) Should the trial court reverse its decision to judicially commit Mr. Reed absent clear and convincing evidence, as of the time of the January 7, 2025 hearing, that all available less drastic alternatives to judicial commitment were unsuitable to meet the needs of Mr. Reed?

(6) Even if the trial court did not initially err in judicially committing Mr. Reed, should this court's order of judicial commitment now be reversed based upon the January 24, 2025 letter from the Department of Disability and Aging, which states that Mr. Reed would benefit from "continued treatment at [HJC]" and "would also benefit from increased service and intervention in the community as well as supported living with consistent

staff and supervision," such that the Department now appears to have the future goal of transitioning Mr. Reed "to a less drastic alternative and improved functioning upon his return to the community," which means there is no clear and convincing evidence that all available less drastic alternatives to judicial commitment are unsuitable to meet the needs of Mr. Reed, and in fact indicates just the opposite?

The Defendant filed a timely application from the trial court's order granting review. The State filed a timely answer in opposition to the Defendant's application. The application and attachments thereto are sufficient for this court's review.

## ANALYSIS

Rule 9 provides the following criteria for determining whether to grant interlocutory appeal:

> (1)     the need to prevent irreparable injury, giving consideration to the severity of the potential injury, the probability of its occurrence, and the probability that review upon entry of final judgment will be ineffective;

> (2)     the need to prevent needless, expensive, and protracted litigation, giving consideration to whether the challenged order would be a basis for reversal upon entry of a final judgment, the probability of reversal, and whether an interlocutory appeal will result in a net reduction in the duration and expense of the litigation if the challenged order is reversed; and

> (3)     the need to develop a uniform body of law, giving consideration to the existence of inconsistent orders of other courts and whether the question presented by the challenged order will not otherwise be reviewable upon entry of final judgment.

Tenn. R. App. P. 9(a).

At the outset, this court observes that the Tennessee Supreme Court has stated repeatedly that "interlocutory appeals to review pretrial orders or rulings, i.e., those entered before a final judgment, are 'disfavored,' particularly in criminal cases." *State v. Gilley*, 173 S.W.3d 1, 5 (Tenn. 2005); *see also State v. Meeks*, 262 S.W.3d 710, 720 (Tenn. 2008); *State v. McKim*, 215 S.W.3d 781, 790 (Tenn. 2007); *State v. Scarborough*, 201 S.W.3d 607, 612 n.2 (Tenn. 2006); *Reid v. State*, 197 S.W.3d 694, 699 (Tenn. 2006); *State v. Williams*, 193 S.W.3d 502, 506 (Tenn. 2006). "[T]hus, it is incumbent on the party seeking the appeal . . . to satisfy the court or courts that there are appropriate grounds for

an interlocutory appeal." *Meeks*, 262 S.W.3d at 720.

In his application before this court, the Defendant argues that interlocutory review of the trial court's denial of the Defendant's motion to dismiss and its granting the State's motion for judicial commitment should be reviewed under all three Rule 9 criteria. The Defendant asserts that interlocutory review is required to review the trial court's decisions because "review upon entry of final judgment [in the criminal case] will never be effective to redress the months, years, or even decades of unlawful confinement and restricted liberty that is likely to occur" without interlocutory review. In other words, the Defendant argues that an indefinite involuntary commitment—while the criminal charges remain pending and while those criminal charges limit the less drastic alternatives available to the Defendant—constitutes an irreparable injury that may be avoided by interlocutory review. Tenn. R. App. P. 9(a)(1). Likewise, the Defendant asserts that interlocutory review will prevent protracted litigation because the Defendant is presently subjected to an indefinite involuntary commitment from which he may never attain competency to adjudicate the criminal charges and pursue an appeal as of right. Tenn. R. App. P. 9(a)(2). Finally, the Defendant asserts that this court should grant interlocutory review to develop a uniform body of law because "Tennessee's judicial commitment procedures—insofar as they treat intellectually disabled persons differently when they are accused of a criminal offense, are presumed innocent, and have not been found guilty—are unconstitutional, are straining the limited resources of the [TDDA], and are causing inconsistency and uncertainty in the law." Tenn. R. App. P. 9(a)(3).

In response, the State urges this court to deny the Defendant's application, arguing that three of the certified issues require an advisory opinion and that the remaining three certified issues do not warrant interlocutory review. The State claims that

> The only issues that could be cognizable on an appeal are 1) whether the trial court erred in denying Mr. Reed's motion to dismiss his charges; 2) whether the trial court properly committed him; and 3) whether the commitment standards satisfy constitutional norms.

As to its argument that several of the certified issues seek an advisory opinion, the State asserts that certified issues two and six ask for advisory opinions because they relate to the effect Dr. Ipke's January 24, 2025 letter has on the trial court's order while the trial court has not made a ruling regarding the impact of the letter. Likewise, the State asserts that certified issue three: "If the criminal case against Mr. Reed is dismissed, does this Court have the power to continue enforcing Mr. Reed's judicial commitment to the care and custody of the Department of Disability and Aging?" seeks an advisory opinion because it is based on something that has not and may not occur—dismissal of the charges and probation violation warrants.

12

To be clear, "Tennessee courts have long recognized that 'the province of a court is to decide, not advise, and to settle rights, not give abstract opinions.'" *West v. Schofield*, 468 S.W.3d 482, 490 (Tenn. 2015) (quoting *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.,* 301 S.W.2d 196, 202 (Tenn. 2009) (citations omitted). To that end, "a legal controversy exists 'when the disputed issue is real and existing, and not theoretical or abstract, and when the dispute is between parties with real and adverse interests.'" *Id.* (quoting *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W.3d at 202). Tennessee courts apply justiciability doctrines to determine whether a particular case involves a legal controversy. *Id.* The justiciability doctrine of ripeness is implicated by the State's advisory opinion argument. Questions of ripeness require a court to determine "whether the dispute has matured to the point that it warrants a judicial decision." *Id.* (quoting *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010)).

In our view, the trial court's February 11, 2025 order granting the Defendant's motion for interlocutory review shows that the trial court considered Dr. Ipke's January 24, 2025 letter in its analysis and determination to grant the Defendant's motion for interlocutory appeal. Therefore, we determine that the effect of the letter on the propriety of the trial court's judicial commitment order is justiciable for inclusion in the application. However, we agree that certified issue three is not ripe—and therefore, not justiciable—because the trial court has not granted a motion to dismiss. Any consideration of the trial court's authority to enforce the judicial commitment order if the charges and probation violation warrants are dismissed would be theoretical at this procedural stage.

The State also argues that certified issues one, four, and five do not meet the criteria for interlocutory review because they "reflect no probability of irreparable injury, probability of reversal, or inconsistent orders of other courts." Essentially, the State argues that the trial court correctly denied the Defendant's motion to dismiss and ordered judicial commitment and, therefore, the Defendant has failed to establish grounds for interlocutory review.

This court, respectfully, disagrees with the State's argument that the remaining certified issues do not satisfy the criteria for interlocutory review. We are persuaded that irreparable injury and protracted litigation may result unless the Defendant is afforded interlocutory review of the trial court's decisions denying his motion to dismiss the charges and involuntarily committing him to the custody of the TDDA. Absent an interlocutory appeal, the Defendant simply has no other method of review until a final judgment is entered in the 2016 cases and the 2023 case. Given the Defendant's current competency status, there is no certainty when, or if, a final adjudication of the cases will occur. We also determine that interlocutory review is necessary to develop a uniform body of law concerning the constitutionality of Tennessee Code Annotated section 52-5-404. Our

13

conclusion that an interlocutory appeal is warranted is consistent with this court's review of similar issues in other cases. *See*, *e.g.*, *State v. Griggs*, No. W2023-01685-CCA-R9-CD, 2025 WL 1029500 (Tenn. Crim. App. Apr. 7, 2025) (review of trial court's order denying the defendant's motion for release from custody after being found incompetent to stand trial due to his intellectual disability); *see also State v. Yancey*, No. W2022-00131-CCA-R3-CD, 2022 WL 6257321, at *4 (Tenn. Crim. App. Oct. 10, 2022) (stating that "the appropriate appellate avenue from which the defendant could appeal the [mandatory outpatient treatment plan] modification order was through a discretionary appeal pursuant to Rule 9 or 10 of the Tennessee Rules of Appellate Procedure"). Therefore, we conclude that the Defendant provided satisfactory grounds to grant the application for interlocutory appeal on the presented issues, as limited and clarified by this order.

## CONCLUSION

Accordingly, the Defendant's application for permission to appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure is GRANTED, in part, and DENIED, in part. Based upon our limitation and discussion of the issues presented, we certify the following issues for review:

(1) Whether the trial court erroneously denied the Defendant's motion to dismiss the new criminal charges and the probation revocation warrants?

(2) Whether the trial court erroneously granted the State's motion for judicial commitment?

(3) Whether the judicial commitment statute outlined in Tennessee Code Annotated section 52-5-404 violates the Equal Protection Clause of the Fourteenth Amendment?

The record on appeal shall be transmitted to this court within the time provided by Rule 9(e) of the Rules of Appellate Procedure. This appeal shall then proceed in accordance with the rules of appellate procedure and the rules of this court.

JUDGE KYLE A. HIXSON
JUDGE ROBERT H. MONTGOMERY, JR.
JUDGE STEVEN W. SWORD

14